STATE OF NEBRASKA EX REL. CLARENCE S. BECK, ATTORNEY GENERAL, AND THE DEPARTMENT OF BANKING OF THE STATE OF NEBRASKA, APPELLANT, V. ASSOCIATES DISCOUNT CORPORATION, A FOREIGN CORPORATION, ET AL., APPELLEES, THEODORE L. RICHLING, RECEIVER, APPELLANT.

96 N. W. 2d 55

Filed April 3, 1959. No. 34398.

*Clarence S. Beck,* Attorney General, and *Robert A. Nelson,* for appellant State.

*Shotwell, Vance & Marchetti,* for appellant Richling.

*John W. Delehant, Jr.,* for appellees.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

WENKE, J.

This appeal involves an action commenced in the district court for Douglas County on July 7, 1955, by the State of Nebraska ex rel. Clarence S. Beck, Attorney General, and the Department of Banking of the State of Nebraska against Associates Discount Corporation, a foreign corporation, and Jack F. Kemnitz.

The early history of this litigation can be found in two of our opinions dealing with a former appeal of this cause. The first opinion is reported as State ex rel. Beck v. Associates Discount Corp., 161 Neb. 410, 73 N. W. 2d 673. Therein we overruled the motion of defendants, appellees therein, to vacate and dissolve our temporary restraining order of December 3, 1955, which order restrained defendants from performing certain acts therein enumerated. Our order of December 3, 1955, also appointed a receiver to take charge of the defendant Associates Discount Corporation's assets, which we had ordered to be impounded. The clerk of this court approved the bond tendered by the receiver we appointed and the receiver thereupon took possession of the assets of Associates Discount Corporation on December 12, 1955, and is still in possession thereof. The second of our opinions dealing with this first appeal is reported as State ex rel. Beck v. Associates Discount Corp., 162 Neb. 683, 77 N. W. 2d 215. Therein we determined that the plaintiff, appellant therein, was a proper party to maintain the action and that its amended and supplemental petition stated a cause of action. We thereupon ordered the cause to be tried upon the merits and remanded it to the trial court for that purpose. In doing so we also granted plaintiff, appellant therein, a temporary injunction and continued the receivership in full force and effect. The law therein announced is here controlling as the law of this case.

Thereafter plaintiff sought to amend paragraph VI and the prayer of its amended and supplemental petition. Its request to do so should have been granted. In its amended and supplemental petition, as thus amended, plaintiff alleged:

"That the defendants and each of them have failed to procure a license to conduct an installment loan business in the State of Nebraska and, with the intent of evading the usury laws of the state, have engaged in a devise (device) and subterfuge by means of which they have exacted excessive, unlawful, exorbitant, unconscionable and usurious charges for the making of installment loans to purchasers of automobiles, as hereinafter more specifically set forth.

"That for the purpose of carrying out said devise (device) and subterfuge the defendant, Associates Discount Corporation, purports to be engaged solely in the business of purchasing, at a discount, from automobile dealers, notes and mortgages and conditional sales contracts covering the sales of automobiles; that, in fact, none of these contracts represent bona fide time sales transactions but constitute direct loans by the defendant, Associates Discount Corporation, to the purchasers of such automobiles."

Plaintiff then goes on to allege in detail the technique or methods used by the defendants to accomplish their purpose and, by reason thereof, allege: "That all of the loans made by defendants in violation of law, as hereinbefore set forth, are void and uncollectible." For a full statement of these details, and our discussion thereof, see State ex rel. Beck v. Associates Discount Corp., 162 Neb. 683, 77 N. W. 2d 215. The plaintiff then goes on to allege that the defendants have, in making such loans, violated the Installment Loan Act in many ways. We shall not here set out each separate claim in that respect but will refer thereto whenever the evidence adduced is sufficient to support such contention.

The prayer, insofar as here material, asks that the

"court order, adjudge and decree that the defendants and each of them have been operating an installment loan business in the State of Nebraska wrongfully and in violation of the law; that the method of doing business by the defendants is a device and subterfuge engaged in by the defendants with the intent of evading the usury laws of this state; that the defendants have made excessive, unlawful, exorbitant, unconscionable and usurious charges upon loans; that the notes and mortgages and other instruments of indebtedness taken by the defendants are void and uncollectible and should be cancelled; that the method of doing business used by the defendants is contrary to the public policy of the state; * * * that upon final hearing a permanent injunction be entered enjoining the defendants from engaging in the installment loan business in the State of Nebraska in the manner set forth in this petition or in any other manner in violation of the laws of the state; * * * that defendants be required to account to this Court for all the monies coming into their hands upon the contracts which are the subject of this action, subsequent and pursuant to the order of this Court entered herein on July 19, 1955, and to and including December 3, 1955, and that defendants be ordered and directed to pay to the Receiver herein all monies so collected; and that the receiver be ordered to refund to all borrowers who have made payments on such void loans after the commencement of this action the money so paid * * * and for such other and further relief as equity may require."

Trial on the merits was had commencing on January 30, 1957, and extending through March 7, 1957. The trial court rendered its decision on December 11, 1957. Plaintiff filed a motion for new trial and has taken this appeal from the overruling thereof.

The trial court's findings and orders are many and detailed. In equity cases we consider the record de novo and, in so doing, apply the usual principles applicable

in such cases. See, McNish v. General Credit Corp., 164 Neb. 526, 83 N. W. 2d 1; Uptegrove v. Elsasser, 161 Neb. 527, 74 N. W. 2d 61. Such principles include the following: "In the consideration of an equity suit on appeal, if there is an irreconcilable conflict in the testimony on a material issue, this court will, in determining the weight of the evidence of witnesses who appeared in court to testify, consider the fact that the trial court observed them and their manner of testifying, and must have accepted one version of the facts rather than the other." Uptegrove v. Elsasser, *supra*. This being an equity action, we will consider the record accordingly and come to our own conclusion as to what the rights of the parties are. In view thereof nothing would be gained by setting out in detail the findings and orders of the trial court.

While the decree of the trial court is generally favorable to the appellees there are, however, certain parts thereof which are favorable to the appellant. Appellees have not cross-appealed. In view of that fact the following principle is applicable: "The right of an appellee in an action to have reviewed a portion of a judgment or decree against him depends upon whether or not he has perfected a cross-appeal and has assigned error in relation thereto agreeable to the provisions of statute and the rules of this court." Pavel v. Hughes Brothers, Inc., 167 Neb. 727, 94 N. W. 2d 492.

For convenience we shall herein refer to the appellant as the state and to the appellees as such except as we may refer to them separately. In the latter situation we shall refer to Associates Discount Corporation as Associates and to Jack F. Kemnitz as Kemnitz. The primary question presented is, were the appellees unlawfully engaged in the operation of an installment loan business without having procured a license to do so?

Associates, an Indiana corporation, is a wholly owned subsidiary of Associates Investment Company, also an Indiana corporation. We shall herein refer to Associates

Investment Company as the parent company. The parent company has its principal place of business in South Bend, Indiana. Sometime in 1947 Associates, being then qualified to do business in the State of Nebraska as a foreign corporation, opened a branch office in Omaha, Nebraska, ostensibly for the purpose of engaging in the business of purchasing, at a discount, purchase money notes, mortgages, and contracts covering time sales of automobiles from car dealers in Omaha and the surrounding territory. Sometime in 1949 Kemnitz became the resident manager and general supervisor of Associates' Omaha branch, which was located at 216 W.O.W. Building at Fourteenth and Farnam Streets. Kemnitz continued in that capacity and was such on July 7, 1955, when this action was instituted by the state. Associates ceased its buying operations sometime shortly after July 7, 1955, following the institution of this action, and left the State of Nebraska in June of 1956, thus closing its Nebraska operations as the Omaha office was its only place of business in the state.

At the time this action was started Associates had at its Omaha branch office some 1,175 contracts, or rewrites thereof, involving the sale of automobiles. These contracts Associates had acquired through or from some 58 different car dealers. Most of them had been acquired from or through car dealers in Omaha and the territory immediately surrounding it in Nebraska and Iowa. However, Associates owned a few contracts that had apparently been acquired through or from dealers beyond that territory but in the continental United States.

As herein used a contract refers to the note and mortgage given by a buyer of a car, in connection with the purchase thereof, to the dealer from whom he was buying it. Such note and mortgage were made out to the dealer. The note and mortgage were then assigned by the dealer, without recourse, to Associates. They would always be accompanied by a certificate of title

to the car or truck purchased on which certificate of title a lien for the amount of the indebtedness, evidenced by the note and chattel mortgage, was endorsed. These contracts were of two types, being either level payment or balloon. The level payment type of contract provided for equal monthly payments usually over a period of either 24 or 30 months. The balloon type usually provided for 12 or 18 monthly payments, the first 11 or 17 of which would be equal but the last of which would be a large or balloon payment. A rewrite of any such contract would arise whenever the time for payment of any part of the debt owing was extended. Refinancing was accomplished by executing a new note and mortgage for the amount of the unpaid balance of any contract, after a finance charge and usually insurance premiums, had been added thereto.

If the foregoing contracts, or any part thereof, can be said to have been loans then neither of the appellees had authority to make them for it is admitted that neither of them ever had a license to operate an installment loan business in the State of Nebraska.

Emmco Insurance Company, an Indiana corporation with its principal place of business at South Bend, Indiana, but licensed to do business in Nebraska since 1940, is also a wholly owned subsidiary of the parent company except as the directors thereof may hold qualifying shares. The Emmco Insurance Company is only authorized to write automobile property and collision insurance. Property insurance included fire, theft, and comprehensive coverage. Of the 1,175 contracts that Associates held at the time of this action 695 included policies of insurance issued by Emmco Insurance Company.

Old Republic Credit Life Insurance Company, later changed to Old Republic Life Insurance Company, is a corporation licensed to do business in Nebraska. We shall herein refer to this company as Old Republic. On August 3, 1953, Old Republic entered into a contract

with the parent company whereby Old Republic agreed to insure, subject to certain limitations therein provided for, the lives of the latter's installment contract debtors. At the same time these same parties, subject to certain limitations therein provided for, entered into a contract of the same nature covering credit health and accident insurance. These contracts continued in force and effect until on and after July 7, 1955, and, by their terms, covered the debtors of any or all associated, affiliated, or subsidiary companies or corporations of the parent company. Of the 1,175 contracts held by Associates on July 7, 1955, 624 either had all or some form of credit life, health, or accident insurance. Practically all of these policies were issued under and pursuant to the policies entered into by the parent company with Old Republic.

On the same day, August 3, 1953, Old Republic entered into a reinsurance treaty with Alinco Life Insurance Company whereby the latter would, with certain exceptions therein provided for, reinsure 18 percent of the credit life insurance written by Old Republic upon individual lives. On July 1, 1954, this was increased to 27½ percent, and again on July 1, 1955, it was further increased to 58½ percent. Alinco Insurance Company is also a wholly owned subsidiary of the parent company.

It thus becomes apparent that the parent company would receive, either directly or indirectly, some benefit from the sale of these policies of insurance by Associates since it was and is the sole owner of both Emmco Insurance Company and Alinco Insurance Company.

The installment loan statutes include all persons or parties violating any of the inhibitory provisions thereof whether they be licensees or nonlicensees. See, State ex rel. Beck v. Associates Discount Corp., 162 Neb. 683, 77 N. W. 2d 215; Nelson v. General Credit Corp., 166 Neb. 770, 90 N. W. 2d 799. As stated in State ex rel. Beck v. Associates Discount Corp., 162 Neb. 683, 77 N. W. 2d 215: "* * * the permissive provisions of the in-

stallment loan statutes apply to licensees, but every inhibitory provision therein applies to both licensees and nonlicensees and the officers and employees of either or both."

The burden is on the state to establish its cause of action. See, Kucaba v. Kucaba, 146 Neb. 116, 18 N. W. 2d 645; 20 Am. Jur., Evidence, § 135, p. 138. As stated in 31 C. J. S., Evidence, § 110, p. 718: "The burden of evidence at any particular time rests on the party who would be defeated if no further evidence were introduced; * * *." However, in cases of this character courts will look through the form to the substance of the transactions in order to determine whether there have been bona fide time sales or loans. See, Nelson v. General Credit Corp., *supra;* State ex rel. Spillman v. Central Purchasing Co., 118 Neb. 383, 225 N. W. 46. As stated in State ex rel. Beck v. Associates Discount Corp., 162 Neb. 683, 77 N. W. 2d 215: "Ordinarily, usurious transactions take forms which on their face appear to be legal. Devices, subterfuges, schemes, and circumvention to conceal usury are innumerable. * * * The applicable principle and rationale (is) that courts in usury cases must look through the form to the substance of transactions by unlawful money lenders * * *." In this respect a practice, if well established, will be presumed to have been followed until the contrary is shown. See, 9 Wigmore on Evidence (3d Ed.), § 2487, p. 281; Lincoln Joint Stock Land Bank v. Bexten, 125 Neb. 310, 250 N. W. 84; State v. Fray, 214 Iowa 53, 241 N. W. 663, 81 A. L. R. 286; Constable v. National Steamship Co., 154 U. S. 51, 14 S. Ct. 1062, 38 L. Ed. 903; Cataneo v. United States, 167 F. 2d 820. As stated in Cataneo v. United States, *supra:* "When the status of a person or a state of affairs is proved to have existed at a particular time, the continuance of this status or relationship is presumed." And as held in Lincoln Joint Stock Land Bank v. Bexten, *supra:* " 'A fact, relation, or state of

things once shown to exist is presumed to continue until the contrary appears.' "

As stated in Powell v. Edwards, 162 Neb. 11, 75 N. W. 2d 122: "* * * an automobile dealer may in good faith sell a car on time for a price in excess of the cash price without tainting the transaction with usury, though the difference in prices may exceed lawful interest for a loan. * * * It is also true that a time sale made in good faith at a price in excess of a cash price, even though the difference exceeds lawful interest for a loan, which price is arrived at by schedules furnished by a finance company which solicits contracts so entered into between a purchaser and a dealer, may not be regarded as being tainted with usury." See, also, Nelson v. General Credit Corporation, *supra;* McNish v. General Credit Corp., *supra.* And the same would be true if the dealer called the finance company for that information. See McNish v. Grand Island Finance Co., 164 Neb. 543, 83 N. W. 2d 13. But as stated in Nelson v. General Credit Corp., *supra,* by quoting from McNish v. General Credit Corp., *supra:* "These rules however do not apply where it is proved that the transaction was not made in good faith but that it was a scheme and a device pursued to evade the operation against it of the usury statute."

"In order to have the foregoing principles apply it must appear that the buyer actually was informed of and had the opportunity to choose between a time sale price and a cash sale price. It is not enough to merely show that the instruments signed evidencing the indebtedness refer to a time price or time differential when, in fact, the buyer was never quoted a time sale price as such." McNish v. General Credit Corp., *supra.*

It is not a time sale if a car dealer, in selling a car, actually agrees with the buyer that he will finance (take care of) the balance of the cash purchase price agreed upon and does so, either directly or through others, even though he obtains the schedule of payments

and the total amount thereof from a rate chart furnished by a finance company or obtains that information from a finance company by calling its office and then fully informs the buyer of the amount he will be required to pay and the terms thereof. Such a transaction would be a loan to finance the balance of the cash purchase price and if payable in installments must meet the requirements of the statutes relating thereto. And the fact that the buyer knew the terms and provisions of such loan at the time it was made and voluntarily entered into it would not have the effect of waiving the illegality of any provision thereof, if such provision was actually in violation of any of the inhibitory provisions of the installment loan statutes, for the purpose of the Legislature in enacting such laws was, as a matter of public policy under its police powers, to regulate the lenders of money on installment loans as a protection to those of the general public who find it necessary to borrow money on that basis. See McNish v. General Credit Corp., *supra.* As we said therein by quoting from State ex rel. Beck v. Associates Discount Corp., 162 Neb. 683, 77 N. W. 2d 215: "Their purpose and design is to license and control the business of making such installment loans, and to restrict the enforcement and collection of illegal installment loans once they have been made by either licensees or nonlicensees, * * * all of such borrowers are regarded not as in pari delicto but as in viniculus (sic) to defendants, to whom they owe no duty in equity." See, also, Seebold v. Eustermann, 216 Minn. 566, 13 N. W. 2d 739, 152 A. L. R. 585.

In construing section 45-105, R. R. S. 1943, which relates to the maximum interest authorized by section 45-101, R. R. S. 1943, we said in Loucks v. Smith, 154 Neb. 597, 48 N. W. 2d 722: "In order to constitute usury, there must be (1) a loan, express or implied; (2) an understanding between the parties that the money lent shall or may be returned; (3) that for such loan a greater rate of interest than is allowed by law shall be paid or

agreed to be paid, as the case may be; and (4) a corrupt intent to take more than the legal rate for the use of the money loaned. * * * The intent which is necessary to constitute usury is not a specific intent to violate the statute but an intent to exact payments which exceed the amount of interest allowed by statute." While all of the contracts, or rewrites thereof, that are hereinafter declared void were, in effect, installment loans, it should be remembered that installment loans are, by the provisions of the statutes hereinafter set forth relating thereto, void and uncollectible for many reasons other than for charging interest thereon in excess of the maximum authorized.

Statutes governing "Installment Loans" are sections 45-114 through 45-158, R. R. S. 1943, together with all amendments that have been made thereto. Section 45-128, R. R. S. 1943, provides, insofar as here material, that: "Any firm or individual members thereof, * * * or corporation or officers thereof, or person, who by any device, subterfuge or pretense whatsoever, shall engage in or continue any of the kinds of business or enterprise permitted to licensees by sections 45-114 to 45-155 without having obtained the license therein required, with intent to evade the provisions of said sections, shall be deemed guilty of a misdemeanor, * * *." Section 45-155, R. R. S. 1943, provides: "Violation of sections 45-114 to 45-155 in connection with any indebtedness, however acquired, shall render such indebtedness void and uncollectible." As stated in McNish v. General Credit Corp., *supra:* "In view of this language we think the Legislature intended a lender should have nothing in such a situation." See, also, A-1 Finance Co., Inc. v. Nelson, 165 Neb. 296, 85 N. W. 2d 687.

The provisions of the installment loan statutes, insofar as here material, provide as follows: "Every licensee hereunder may make loans, not exceeding one thousand dollars in principal amount, and may contract for and receive thereon charges at a rate not exceeding thirty-

six per cent per annum on that part of the unpaid principal balance on any loan not in excess of one hundred and fifty dollars, thirty per cent per annum on that part of the principal balance on any loan in excess of one hundred and fifty dollars and not in excess of three hundred dollars, and nine per cent per annum on any remainder of such unpaid principal balance." § 45-137, R. R. S. 1943. "No licensee shall directly or indirectly charge, contract for, or receive a greater rate of interest than nine per cent per annum upon any loan, or upon any part or all of any aggregate indebtedness of the same person, in excess of one thousand dollars." § 45-138, R. S. Supp., 1955. "No licensee shall enter into any contract of loan under sections 45-114 to 45-155, under which the borrower agrees to make any payment of principal more than twenty-one calendar months from the date of making such contract, if such contract is not secured by a bona fide duly recorded mortgage on real estate owned by the borrower * * *." § 45-138, R. S. Supp., 1955. "Every loan contract shall provide for repayment of principal and charges in installments which shall be payable at approximately equal periodic intervals of time and so arranged that no installment is substantially greater in amount than any preceding installment * * *." § 45-138, R. S. Supp., 1955. "Charges on loans made under sections 45-114 to 45-155, shall not be paid, deducted or received in advance. Such charges shall not be compounded; * * * In addition to the charges herein provided for, no further or other amount whatsoever shall be directly or indirectly charged, contracted for, or received." § 45-137, R. R. S. 1943. "The licensee shall not require the purchasing of insurance from the licensee as a condition precedent to the making of the loan, and shall not decline existing insurance where such existing insurance is provided by an insurance company duly licensed by this state." § 45-141, R. R. S. 1943. "No such person, firm, partnership, corporation or association so licensed shall receive any chattel

mortgage * * * signed in blank, but all blank spaces shall be filled in with ink or typewritten or printed with the proper names and amounts, showing the name of the person, firm, partnership, corporation or association by whom the person making the conveyance or assignment is employed." § 45-142, R. R. S. 1943. "No licensee shall take * * * any instrument signed in which blanks are left to be filled after execution." § 45-143, R. R. S. 1943.

The provisions of sections 45-142 and 45-143, R. R. S. 1943, being special statutes relating to a specific subject, installment loans, are here controlling rather than section 62-114, R. R. S. 1943, which relates to negotiable instruments generally. Of course, if the contracts held by Associates are in fact all bona fide time sale contracts, then the provisions of the installment loan statutes would have no application thereto. If, on the other hand, they are in fact installment loans then if they fail to meet the standards thereof, as fixed by the Legislature, they are subject to the penalties and forfeitures therein provided.

The record of the oral testimony taken at the trial of this cause is extensive and, with the thousands of exhibits offered and received in evidence, make a very voluminous record. It would not be practical to outline this evidence in any detailed manner nor would doing so serve any useful purpose. We will state our conclusions as derived from a study thereof and render our opinion based thereon.

The evidence establishes that the Lied Motor Car Company of Omaha, Nebraska, a dealer in Buick automobiles and hereinafter called Lied, handled the financing of most of their car sales through Associates. On July 7, 1955, when this action was brought, Associates held 274 contracts and 79 rewrites originally acquired through Lied. Generally the financing thereof was handled in the following manner: When a prospective buyer came to any of Lied's places of business in Omaha

to purchase a car the salesman with whom he dealt would quote him a cash price for the kind of car he wanted, which would include the price of any accessories the prospective buyer might choose to have placed thereon. Then Lied would have some one on its staff appraise the prospective buyer's car, if he had one to trade in, which he usually did, and inform the buyer of the amount he would be allowed therefor on the purchase price of the new car. At the same time it would be determined the amount of cash, if any, the buyer could pay and occasionally a discount would be allowed. When these amounts had been determined, and the balance of the cash purchase price agreed upon, then, if the prospective buyer informed the salesman that he would need time in which to pay the balance, the salesman would advise the prospective purchaser that they could take care of that, sometimes advising the buyer that Associates would handle it. The salesman handling the sale would then, without stating any time price to the purchaser, have the purchaser fill in and sign a "Purchaser's Statement" or "Purchaser's Statement and Application for Credit," either of which included all information necessary for the purpose of obtaining credit. If either of the foregoing were signed in blank the salesman would get such information from the buyer as the credit application called for. This information would include the buyer's statement as to how much he thought he would be able to pay per month and for how long a period of time. A "Car Invoice" showing the delivered price of the car, including accessories, as the "Total Cash Price" and the allowances, including any trade-in, cash payments, or discount, if any, would be filled in. There was typed on this "Car Invoice" that: "Balance to be paid by Associates Discount—Their Finance," or words to that effect. Lied would then call Associates to see if the buyer's credit was all right, giving Associates all the credit information it had obtained. Lied would, at the same time, advise Associates fully as to

the price of the car being purchased; whether it was new or old; the amount allowed for a trade-in, if any; the amount of cash paid, if any; the amount of discount that had been allowed, if any; the amount of the unpaid balance of the cash purchase price; and what the buyer thought he could pay per month and for how long. If Associates approved the buyer's credit and agreed to accept the paper it would then fix its own terms, which would include finance charges, insurance premiums, an occasional "Pack," and type of payments, which would be either balloon or level type, and inform Lied thereof. In doing so a substantial amount was usually set aside for the dealer as a bonus or as a commission. Occasionally an additional cash payment was required in order to make the paper acceptable to Associates and Lied would be informed of that fact. If the buyer agreed thereto then Associates would be so advised. In either event, when the paper was finally acceptable to Associates, Lied was so informed. The buyer was then informed by Lied that his credit was all right and the deal had gone through. At this time the buyer, before being permitted to take the car he was purchasing, was required to and signed, among other papers, a blank "Motor Vehicle Invoice Form" and a blank note and mortgage, giving the dealer the authority to fill them in. At the same time the buyer was always informed of what his monthly payments would be but usually was not informed of the total of his obligation, the latter including the finance charges made and insurance premiums that had been included by Associates. However, occasionally the buyer was informed of what the total of his payments would be. When these papers had been signed in blank the purchaser was permitted to take the car. Thereafter the "Motor Vehicle Invoice Form" that had been signed by the buyer in blank was filled in by Lied. When so filled in it disclosed the terms of the installment payments owing by the buyer, including the finance charges and insurance premiums. This and the "Car Invoice"

already referred to as showing the "Balance (of the cash purchase price) to be paid by Associates Discount - Their Finance" were then mailed to the buyer. They were usually received by the buyer about a week or 10 days after the sale had been closed and the car delivered. This was usually the first knowledge the buyer had of the amount of the charge made to finance the balance of the purchase price and what amounts had been included for insurance. It was also usually the first time he knew the total amount he owed although, as previously stated, occasionally the buyer would be given the amount thereof at the time he received the delivery of the car. The note and mortgage were then filled in either by Lied or Associates, but more often in the office of Associates. The terms were those that had been fixed by Associates upon accepting the deal and of which the buyer was usually not informed at the time of the sale, and of which he usually did not become aware until he received the "Motor Vehicle Invoice Form" in the mail from Lied. These notes were payable in installments. The notes and mortgages were always filled in so as to be made payable to Lied and then endorsed by Lied to Associates "Without Recourse." When the deal had been fully completed Associates would pay Lied the full amount of the balance of the cash purchase price, although on rare occasions a "D.A." certificate would be issued to the dealer for a part thereof, and would, periodically, pay Lied the dealer's bonus as it accumulated. In fixing the terms of these contracts Associates almost always charged substantially more for financing the balance of the purchase price than the maximum interest rate allowed by statute for installment loans. It otherwise violated the inhibitory provisions of the Installment Loan Act by providing, in many instances, for a balloon payment; in many instances for level monthly payments in excess of 21 months; in many instances by causing the buyer to take out insurance through it when such insurance had not been ordered

or even discussed by the buyer with the dealer; in other instances when the buyer did not want such insurance; and in still other instances insurance was required to be taken out through Associates although the buyer had comparable insurance in another company. After the note, and mortgage had been filled in and all information sent to the home office at South Bend, Indiana, that office would send the buyer, through the mail, a coupon or payment book showing the total payments owing, together with such insurance policies as the buyer had ordered, been required to take out, or were taken out without his knowledge. These policies included automobile insurance in Emmco Insurance Company and credit life, health, and accident insurance in Old Republic.

We think the foregoing establishes that there was an agreement between Associates and Lied whereby Associates agreed to and did finance for Lied's car buyers the balance owing by them of the cash sale purchase price whenever the buyer needed time in which to pay such balance and, because thereof, Lied never quoted to such buyers any time sale price as such. In handling these sales Lied did so in the manner as has been hereinbefore set forth. This manner of handling permitted Associates to charge such purchasers (borrowers) finance charges in amounts in excess of those permitted by the installment loan laws and to otherwise violate the inhibitory provisions thereof without the purchaser's knowledge. Lied, either wittingly or unwittingly, participated in this plan as the agent of Associates by handling each sale as if it were ostensibly a time sale and by getting the buyer to sign the necessary papers in blank, thus giving Associates the opportunity to intentionally do what it did. That this plan or scheme resulted in a wholesale violation of the inhibitory provisions of the installment loan statutes is evidenced by the following observations: Of the 274 original contracts held on July 7, 1955, by Associates, which con-

tracts it had acquired through Lied under and pursuant to the above plan, we find at least 244 charged interest in excess of the maximum fixed by statute; 122 provided for balloon payments; and 126 provided for level payments in excess of 21 monthly installments. In addition we observe that 111 had Emmco insurance, 159 had Old Republic insurance, and that practically all of the notes and mortgages were signed in blank to be filled in by the dealer after the execution thereof by the buyer.

We think the effect of this plan or scheme engaged in by Associates to have these contracts handled in such a manner as to convince the buyers that they were actually purchasing cars on a time price basis when, in fact, the balance owing on the cash price of each car was being financed by Associates, and thus permit Associates to ostensibly avoid the inhibitory provisions of the installment loan statutes, extends to all of the contracts acquired by Associates through Lied even though a few of them may have been handled by Lied on a proper time sale basis. Having come to the conclusion that this plan or scheme, which was intentionally put into operation by Associates to avoid the inhibitory provisions of the installment loan statutes while engaged in the making of installment loans without having obtained a license to do so, extends to all contracts Associates acquired through Lied, we hold all such contracts are void and uncollectible. See, §§ 45-128 and 45-155, R. R. S. 1943; Powell v. Edwards, *supra;* McNish v. General Credit Corp., *supra.*

While there are some circumstances indicating that Associates dealt similarly with other car dealers from whom it had acquired contracts which it held on July 7, 1955, we do not think the evidence, as a whole, is sufficient to hold that the same or a similar plan or scheme of operations was put into effect by such other dealers acting as agents for Associates. The evidence establishes that in many instances some of these dealers

were actually making, either through themselves or others, installment loans to finance the balance of the cash purchase price of cars which they were ostensibly selling on a time sale basis. However, in the absence of sufficient proof establishing that such dealers, either wittingly or unwittingly, cooperated with Associates in such plan or scheme and, by their conduct, helped put it into effect, there is a presumption of legality as to each contract held by Associates on July 7, 1955, that it had acquired through such dealers. 20 Am. Jur., Evidence, § 240, p. 236; Horton v. Rohlff, 69 Neb. 95, 95 N. W. 36. As stated in Horton v. Rohlff, *supra:* "The rule is that the contract should be supported if possible, rather than defeated. * * * 'there is no presumption against the validity of contracts.'" Whether such sales were bona fide time sales or actually the financing of the balance of the cash purchase price is, of course, a question of fact, for, as stated in Nelson v. General Credit Corp., *supra:* "Within the scope of the above rules each case must depend on its own facts and circumstances." See, also, Curtis v. Securities Acceptance Corp., 166 Neb. 815, 91 N. W. 2d 19; McNish v. General Credit Corp., *supra.*

In view of our holding that all contracts acquired by Associates through Lied are void we must also hold that all rewrites thereof are void. See, State ex rel. Beck v. Associates Discount Corp., 162 Neb. 683, 77 N. W. 2d 215; Nelson v. General Credit Corp., *supra.* As stated in Nelson v. General Credit Corp., *supra:* "The usurious character of a transaction is determined as of the time of its inception, and if a contract is usurious in its inception, no subsequent transaction will cure it. Hence, when a usurious contract is renewed by the giving of a renewal or substituted contract, the usury follows into and becomes a part of the latter contract, making it subject to the defense of usury to the same extent as was the original obligation." Consequently the 79 rewrites of Lied contracts are void and uncollectible.

In the absence of any statute or provision in a contract providing for the method of applying payments made this court has said in Dickson v. Stewart, 71 Neb. 424, 98 N. W. 1085, 115 Am. S. R. 596: "The rule is well established that 'Interest on a judgment or debt due is computed up to the time of the first payment, and the payment so made is first applied to discharge the interest, and afterwards, if there be a surplus, such surplus is applied to sink the principal, * * *.' Mills v. Saunders, 4 Neb. 190, and Davis v. Neligh, 7 Neb. 78." The contracts and rewrites herein involved have no provision therein as to how the payments, when made, are to be applied as to either interest or principal.

In considering the evidence adduced as to individual contracts other than Lied we find the following to be loans made to the purchasers of cars for the purpose of financing the balance of the cash purchase price thereof and not bona fide time sale contracts: Clifford P. Yunker, George A. Scott, John W. Frost, Murray G. Smith, Howard Mattox, Robert A. Bendon, John E. Walker, Sebastino Gaffglione, Floyd Howard Knott, Jr., Dean D. Nissen, Leo M. Barby, Bonnie Louis Beedle, Werner F. Messenbrink, Frederick J. Anderson, Nunzio J. Vaccaro, Glenn P. Bjork, Edmond Tschetter, Richard L. Oakes, Harry S. Swanson, Al H. Snyder, Clinton Gibson, Earl E. Rice, Sylvester Branch, George P. McClure, Robert Freerking, Allan R. Kunce, James Backora, Foster J. Scott, Jr., Donald G. Hurlbutt, Robert M. Hosman, Rev. L. V. Mick, Willie L. Brown, Ray J. Lenz, Don S. Peterson, D. R. Cotter, Stanley Zdan, Leslie M. Hatcher, Arthur Herschlag (2), Robert P. Johnson, and C. Neil Cline.

These loans were all made payable on the installment basis and in one or more respects violated the inhibitory provisions of the installment loan statutes and are therefore void and uncollectible. Thirty-eight of these loans charged interest in excess of the maximum authorized by statute on such loans, 18 provided for a balloon pay-

ment, and 21 provided for more than 21 monthly installments. Five of the foregoing have been rescheduled but such rescheduled extensions are also void and uncollectible for the reasons hereinbefore stated.

It is interesting to note that of the foregoing 41 contracts held to be installment loans that although 10 thereof were made by Associates directly to the purchaser in all but one of those 10 the notes and mortgages were actually made directly to the dealer selling the car and then endorsed by the dealer to Associates "without recourse." This clearly evidences that Associates and Kemnitz were intentionally engaging in a plan or scheme on the part of Associates to cover up their operations of engaging in the installment loan business without a license to do so.

We have found at least three individual contracts, not included in the foregoing list of names, that were, in fact, installment loans to finance the balance of the cash purchase price of automobiles that were entered into in states other than Nebraska as the result of the sales of motor vehicles in such states. These three contracts have provisions therein that violate the inhibitory provisions of the installment loan statutes of Nebraska.

Neither appellants nor appellees pleaded or presented the law of the state wherein these three contracts were entered into. Generally, "* * * with regard to the laws of a sister state, the broad rule prevails that in the absence of a showing to the contrary, such laws will be presumed to be the same as the laws of the forum. To state the rule another way, unless the court's attention is directed to a statute or decision of another state bearing on a question before it, the law of such state will be presumed to be the same as that of the forum." 20 Am. Jur., Evidence, § 178, p. 182. See, also, Scott v. Scott, 153 Neb. 906, 46 N. W. 2d 627, 23 A. L. R. 2d 1431; First State Bank of Herrick v. Conant, 117 Neb. 562, 221 N. W. 691; Stark v. Olsen, 44 Neb. 646, 63 N. W. 37. As stated in First State Bank of Herrick v. Conant,

*supra:* "In the absence of pleading and proof to the contrary, the statutes of a sister state are presumed to be the same as those of this state." We held in Scott v. Scott, *supra,* in discussing the Uniform Judicial Notice of Foreign Law Act passed by the 1947 Legislature, that: "The foregoing statutes were not intended to remove the necessity of pleading and presenting the common law or statutes of another jurisdiction of the United States when recovery based thereon is sought in an action brought in this state to enforce a cause of action arising thereunder. It only removes the requirement of proving it. A court may require that it be pleaded and presented." We then went on to say therein that: "In the absence of the common law or statutes of any other jurisdiction in the United States being pleaded and presented we will presume the common law or statutes of such other jurisdiction to be the same as ours." However, as stated in 20 Am. Jur., Evidence, § 182, p. 188: "A number of courts, however, have adopted the rule that in the absence of proof of the statute law of a sister state, the presumption is that it is the same as the statute law of the state within which an action is brought. Such presumptions do not extend to such statutory enactments as are penal in their nature." We followed this in People's Building, Loan & Savings Assn. v. Backus, 2 Neb. (Unoff.) 463, 89 N. W. 315, wherein we said: "The laws of that state are not pleaded, and even if we concede that the transaction in controversy is to be governed thereby, the result would be the same, since, in the absence of some showing as to the New York law in the record, we will presume it to be the same as our own. Welton v. Atkinson, 55 Neb., 674. This presumption obtains also in cases where usury is alleged. In such cases, in the absence of pleading and proof of the foreign law, the question will be determined according to the law of the forum. Craven v. Bates, 96 Ga. 78, 23 S. E. Rep., 202; Webb, Usury, section 280. It is true there is no such presumption where the local stat-

ute prescribes penalties and forfeitures. Balfour v. Davis, 14 Ore., 47, 12 Pac. Rep., 89. But our statute is not of that character. It does not avoid the whole contract in case of usury, but only limits recovery to the sum actually loaned. Hence there is no reason for refusing to presume it to represent the law in force elsewhere."

Here the statutes involved are penal in character and void the entire contract in case of a violation of any of the inhibitory provisions thereof. See, McNish v. General Credit Corp., *supra;* §§ 45-128 and 45-155, R. R. S. 1943. We think our holding in People's Building, Loan & Savings Assn. v. Backus, *supra,* is here controlling of the contracts entered into in states other than Nebraska.

We find the evidence adduced establishes the contracts of the following individuals to have been bona fide time sales: Harry R. Davis, Roy Benfield, William R. Batth, Joseph O. Edwards, Francis J. Mohatt, Jr., Clifford Drey, Julian C. Eberhart, and Jaushua Foster.

We come then to the rewrite or extensions numbering some 177. They are set out in exhibit "D" of the record. We have already held 84 of these to be void because they are extensions of original contracts that we have held to be void.

First, the method used by Associates in extending these contracts should be set forth. When the debtor of either a balloon or level payment type contract wished to extend the time for payment of any part thereof Associates would take a new note and mortgage from such debtor. The total amount of such new note and mortgage would be determined by adding to the balance of the debt remaining unpaid the finance charge made for extending the time for payment of such balance and any insurance premiums incurred by the debtor for insurance obtained through Associates. However, the original note and mortgage would not be surrendered to the debtor by Associates but were kept by it and not marked

either paid or cancelled. Likewise the certificate of title and the lien endorsed thereon for the original debt were kept by Associates. The lien for the original debt was not cancelled nor was any lien placed on the certificate of title for the indebtedness evidenced by the new note and mortgage. However, when the new note and mortgage had been executed by the debtor extending the loan, then Associates would pay itself the amount of the old unpaid balance and credit that amount to the account of the debtor. We find that by this procedure Associates kept the old note, mortgage, and certificate of title, with the original lien endorsed thereon, as collateral security for the substituted new debt.

In a comparable situation in Chicago Lumber Co. v. Bancroft, 64 Neb. 176, 89 N. W. 780, 57 L. R. A. 910, we said: "The note and mortgage were satisfied for the purpose for which they were executed and retained by the creditor as further security to the notes evidencing the new contract." That is, "The note and mortgage sued on were held as a pledge to the payment of the valid demands owing by the makers to the payee, and nothing more." See, also, State ex rel. Beck v. Associates Discount Corp., 162 Neb. 683, 77 N. W. 2d 215. As stated in State ex rel. Beck v. Associates Discount Corp., 162 Neb. 683, 77 N. W. 2d 215: "We conclude that such claimed rescheduling or forbearance was simply a renewal or substitute for the original contract which was the purported consideration therefor, * * *." Thus the question of Associates' rights must depend upon the validity of the renewal or extension note.

However, appellees contend: "An original valid time sales contract which is not affected by usury can never be invalidated by any subsequent usurious transaction * * *." That this contention has many authorities to support it is beyond question. See, Nichols v. Fearson, 32 U. S. 103, 8 L. Ed. 623; Annotation, 3 A. L. R. 877; Annotation, 102 A. L. R. 574. As stated in Annotation, 102 A. L. R. 574: "It is a general rule that the usurious

nature of a contract or obligation is to be determined as of the time it is entered into, and that, if it is not usurious in its inception, it is not invalidated or tainted with usury by any subsequent usurious transaction with respect thereto." In the early history of this court we followed this doctrine. See, Richards v. Kountze, 4 Neb. 200; Dell v. Oppenheimer, 9 Neb. 454, 4 N. W. 51. However, in Chicago Lumber Co. v. Bancroft, *supra,* we did not choose to do so, which is clearly evidenced by a dissent thereto. Therein we held, by quoting from McDonald v. Beer, 42 Neb. 437, 60 N. W. 868, that: "Where a loan is made at a legal rate of interest and a note executed as evidence of the indebtedness thereby created, and at the maturity of the note a contract is made by which the time of payment is extended and a new note is given in which is included interest on the amount of the loan at a usurious rate for the time of the extension, the renewal note is tainted with usury." The provisions of the usury statute were therein enforced and applied. It should be remembered in reading Chicago Lumber Co. v. Bancroft, *supra,* that what is now section 45-105, R. R. S. 1943, which forfeits only the interest, was involved whereas the statutes herein involved make the entire obligation void and uncollectible.

Applying the reasoning of Chicago Lumber Co. v. Bancroft, *supra,* and our holding therein, to the situation herein presented we think that if any of the provisions of these renewal or extension notes are in violation of the inhibitory provisions of the installment loan statutes that they are void and uncollectible and that no recovery can be had by Associates on the original contracts for which such extensions or renewals were substituted. To hold otherwise would permit the holders of valid obligations to provide for any provisions in a renewal or extension thereof on an installment basis which they could force the debtor to sign and, if collected, they would be that much ahead, but, if the debtor subsequently objected and such provisions were held to be in violation

of some inhibitory provision of the installment loan statutes, the holder would be out nothing for he could then fall back on his original contract. We are certain the Legislature did not so intend by its enactments covering installment loans and we can see no good reason why courts should permit such a loophole to be created, that is, to let the holder of valid obligations violate the provisions thereof with impunity in making extensions or renewals thereof.

Admittedly 165 of these rewrites include finance charges in excess of the maximum permitted by law. We have examined all of the renewal or extension notes held by Associates on July 7, 1955, as contained in exhibit "D", other than the 84 already held void and uncollectible, and find that all but one, that of Harold Damewood, Jr., violate in some manner the inhibitory provisions of the installment loan statutes hereinbefore set forth. Usually such violations consisted of charging interest beyond the maximum limits provided for by statute in such cases, providing for balloon payments or for monthly payments in excess of 21 months. Appellees call our attention to the fact that beginning with June 24, 1955, after examiners from the Department of Banking had examined part of the assets of Associates, and extending through July 7, 1955, when this action was instituted, Associates, in rewriting eight of its contracts, charged a rate that produced less than nine percent simple interest. That is true. However, three of these renewals were of contracts originally acquired through Lied and six provided for monthly payments beyond 21 months and were, because of those provisions, void. We have not been able to find the record of one of these rewrites referred to as Dale Hayden. For the reasons hereinbefore stated we find all of the renewal or extension agreements listed in exhibit "D" of the record to be void and uncollectible except that of Harold Damewood, Jr.

Associates sought to avoid the effect of having over-

charged its debtors when making these extensions or renewals by rescheduling them after July 7, 1955, and giving the debtor credit for all finance charges made in connection with any previous rewrite thereof. It was able to obtain 107 reschedules on this basis and voluntarily credited 58 other accounts for the full amount thereof, of which 6 were paid in full when such credit was applied thereto. But, as we said in State ex rel. Beck v. Associates Discount Corp., 161 Neb. 410, 73 N. W. 2d 673: "* * * violations mentioned cannot be purged by a credit or waiver of interest. If such exactions of interest are usurious, the whole obligation is void and uncollectible under applicable statutes."

Having come to the conclusion that all Lied original contracts and rewrites thereof, the contracts of the individuals herein named and the renewals of any thereof, together with the other rewrites contained in exhibit "D", except the one mentioned, are void and uncollectible, we think the following, as stated in McNish v. General Credit Corp., *supra*, is applicable: "The statutes, which have been hereinbefore quoted, not only provide that a loan made in violation of the installment loan statutes shall be void and uncollectible but further provide that the lender is not entitled to 'receive any principal, interest, or charges on such loan.' See § 45-138, R. S. Supp., 1953. In view of this language we think the Legislature intended a lender should have nothing in such a situation. We therefore come to the conclusion that the appellee must return the payments which it has received on this void loan." As stated in McNish v. General Credit Corp., *supra*, by quoting from Herrin v. Johnson Cashway Lumber Co., 153 Neb. 693, 46 N. W. 2d 111: "It is the practice of courts of equity, when they once have obtained jurisdiction of a case, to administer all the relief which the nature of the case and the facts demand, and to bring such relief down to the close of the litigation between the parties."

In order to perform the obligation imposed upon this

court by the foregoing principle Associates will be required to account to the receiver for all money, or anything else of value, that it has received, either directly or indirectly, since July 7, 1955, in connection with the contracts and rewrites herein held void and uncollectible. These can be ascertained from exhibits Nos. R-12 A and R-12 B. The receiver shall not turn over to Associates any of the assets now held by him, and which will ultimately be returned to Associates, until that is done. Nor shall the bond of Associates given herein, which provides:

"2. That the defendant will obey and carry out all orders of the Court entered herein.

"3. That the defendant Associates Discount Corporation will duly account to the Court for any monies coming into its hands upon the contracts which are the subject matter of this action during the pendency of this action when ordered by the Court to do so," be exonerated until such accounting has been made. Such accounting shall be made of all money or anything else of value received in connection therewith by Associates from and after July 7, 1955, when a "Temporary Restraining Order" was issued by the district court "restraining the defendants and each of them from removing any of their records, files, papers, documents, notes, mortgages, documents and other assets of every kind and description pertaining to the business of Defendants in the State of Nebraska, and further restraining the Defendants and each of them from continuing the making of loans at unlawful and usurious rates in the manner described in Plaintiff's Petition or in any other manner contrary to law or from collecting or attempting to collect any of the unlawful and void loans heretofore made," up to December 12, 1955, when the receiver, being then qualified, took over the assets of Associates and thereafter received all payments of any kind made thereon by the debtors.

When such an accounting has been made by Associates

to the receiver then the receiver is directed to pay to each debtor, whose obligation has been held void and uncollectible, the full amount he has received in connection therewith and, if any amount of such obligation remains unpaid, the receiver is to cancel such unpaid balance and return the cancelled obligation to the debtor together with his certificate of title with the lien thereon cancelled. In other words, each debtor, whose obligation has been declared void, is to be fully freed thereof and placed in status quo. The latter would include the return of any car which, for any reason, might still be in the possession of either Associates or the receiver. In order to fully carry out our findings that these obligations are void and uncollectible we permanently enjoin the appellees, or either of them, from in any manner attempting to collect, either directly or indirectly, any part or all of such void obligations. For, as stated in State ex rel. Beck v. Associates Discount Corp., 162 Neb. 683, 77 N. W. 2d 215: "In such cases as that at bar, plaintiff represents the public, including the borrowers from defendants, for whose benefit the action is prosecuted. * * * To declare such contracts void and uncollectible without cancellation thereof, or, more appropriately, without enjoining their collection, would permit defendants to subsequently use them * * * for purposes of unlawful harrassment and extortion, which this action sought to enjoin. Equity is not so helpless. Equity will always strive to do complete justice. To declare such contracts void and uncollectible and enjoin their collection if they are void and uncollectible, is but a necessary incident to the primary purpose of this action which by injunction and receivership sought to put an end to continuous violations of the civil and criminal provisions of the installment loan statutes, enforce forfeitures as provided therein, and avoid a multiplicity of actions."

The record establishes that appellees were intentionally operating, both directly and indirectly through a

scheme or device, an installment loan business in this state without having obtained a license to do so and were operating such business in an improper and unlawful manner. Such is, of course, contrary to the public policy of this state as declared by the Legislature and should be enjoined. As stated in State ex rel. Beck v. Associates Discount Corp., 162 Neb. 683, 77 N. W. 2d 215, by quoting from State v. Chicago & N. W. Ry. Co., 147 Neb. 970, 25 N. W. 2d 824: "Injunction is a proper remedy to be used by the state in the protection of public rights, property, or welfare, whether or not the acts complained of violate a penalty statute and whether or not they constitute a nuisance." Then going on to say: "The state itself, represented by the Attorney General, has therefore of necessity, in order to protect its people and prevent public wrongs, emerged as the proper party whose duty it is to represent all the public in defense of the state's own sovereignty and bring such actions as that at bar. In doing so, courts have generally recognized the state's right to the equitable remedies of injunction and receivership as a proper and effective method of controlling unlawful lenders under statutes comparable with our own."

But here the appellees contend that because Associates quit acquiring contracts some time shortly after July 7, 1955, left the state in June 1956, and Kemnitz did so in July 1956, no injunction is proper, citing our holding in Leeman v. Vocelka, 149 Neb. 702, 32 N. W. 2d 274, to the effect that: "The remedy by injunction is wholly preventative, prohibitory, or protective, and it will not issue to afford a remedy for what is past but only to prevent future mischief. Rights, if any, already lost, and wrongs, if such, already perpetrated, cannot be restrained or remedied by injunction." Also, as stated in Neff v. Boomer, 149 Neb. 361, 31 N. W. 2d 222: "As a general rule injunction will not issue upon mere apprehension of the possibility of an invasion of rights." But as stated in Conrad v. Kaup, 137 Neb. 900, 291 N.

W. 687: "The relief ordinarily granted in equity is such as the nature of the case, the law, and facts demand, not at the beginning of the litigation, but at the time the decree is entered."

Here some of the contracts will ultimately be returned to Associates, which is still a going corporation engaged in the finance business and of which Kemnitz is still an employee. In connection with the collection of the contracts to be returned to Associates there will come the possibility of renewals or extensions being made which could lead to making installment loans. In view of this fact we think appellees should both be enjoined from engaging in the business of making installment loans in Nebraska until such time as they have been lawfully authorized to do so by the proper authorities of this state. And this is proper in view of the way the appellees have conducted themselves in the past when Associates was authorized to do business in this state, particularly after this suit was instituted.

When the receiver has fully carried out all duties which he is hereinbefore and hereinafter directed to perform, he shall then make a final report to the district court, setting out in full an account of all his acts and doings since November 12, 1957. Whereupon, if the report is found to be a true and correct account, it shall be approved by the district court. Thereupon, that court shall order the balance of the assets then in the receiver's possession to be returned to Associates. When that has been done the receiver shall be discharged and his bond released.

In regard to contracts, if any, returned to Associates by the receiver it should be fully understood that we do not herein adjudicate the rights of any of the parties thereto. The same is true of all contracts that have been fully paid but as to which the rights of the parties thereto have not been herein adjudicated. Also, if the receiver's final report shows that Associates has made a full accounting to him, as is herein directed, then the

bond Associates gave on July 19, 1955, may be exonerated.

There were replevin actions commenced by Associates to which the receiver became a party that are still pending. In such cases, when we have declared the contract or rewrite involved therein to be void and uncollectible, a judgment should be rendered therein accordingly. The same would be true if it involves a contract we have held to be valid. In those cases involving a contract on which we have not directly passed, the parties should be left to litigate their own rights and the receiver should withdraw therefrom.

There were also some actions brought by debtors, which are still pending, to have their obligations declared void in which the receiver was either originally made a party or voluntarily became such. If such cases involve any contracts or rewrites which we have declared void and uncollectible, a judgment should be rendered therein accordingly. The same would be true of any contract that we have herein declared valid. On the other hand if we have not directly passed on any contract involved in any of such suits then the receiver should withdraw therefrom and leave the parties free to litigate their own rights.

In other words, we do not herein adjudicate the rights of either party to any contract which is not directly passed on herein and leave the parties thereto free to take whatever action they may desire to determine what their rights thereunder are.

The receiver, Theodore L. Richling, has also appealed from the decree of the district court. He complains primarily of three things. First, that the trial court erred in failing to approve his reports. Second, that the trial court awarded inadequate fees for him and his counsel. And third, that the trial court erred in failing to make provision for the payment of expenses and fees subsequent to November 12, 1957, and until the receivership is fully completed and terminated. In that respect it should be stated that when hearing was had on the re-

ceiver's reports they covered his acts and doings up to November 12, 1957.

We appointed Theodore L. Richling receiver on December 3, 1955, and he qualified to act as such on December 12, 1955; and the assets of Associates were turned over to him on that date. These assets consisted of 1,175 accounts of which 815 were active and had a face value of $1,054,996.33.

Our order of December 3, 1955, contains the following language: "* * * ordered that the defendants, Associates Discount Corporation, a foreign corporation, and Jack F. Kemnitz, and each of them, be, and they hereby are temporarily restrained and enjoined from collecting or attempting to collect, by legal process or otherwise, or from receiving any of the proceeds of any of the loans described in plaintiff's amended and supplemental petition, and it further appearing to the court that in order to fully protect the rights of all parties pending appeal, a receiver should be appointed and that Theodore L. Richling, attorney of Omaha, Nebraska, is a fit and proper person to act as such receiver. It is therefore further ordered that Theodore L. Richling be and he hereby is appointed as receiver to take possession of all books, records, files, papers, notes, mortgages and other documents pertaining to the business of the defendants now located at 216 WOW Building, Omaha, Douglas county, Nebraska, and he is hereby given all authority generally imposed upon a receiver or as contained in any order of this Court, and specifically is authorized to receive payments from any of said borrowers and to release any mortgage and deliver to said borrower the certificate of title to the automobile upon payment in full to him of the balance due on such loan according to the records of the defendants. * * * It is further ordered that this order remain in effect until further order of this court."

"The receiver is an officer of the court which appoints him." Taylor v. Sternberg, 293 U. S. 470, 55 S. Ct. 260,

79 L. Ed. 599. See, also, State v. Bank of Rushville, 57 Neb. 608, 78 N. W. 281; State v. Nebraska Savings & Exchange Bank, 61 Neb. 496, 85 N. W. 391.

The reports of the receiver show that up to November 12, 1957, he had received payments on these 815 active accounts of $810,676.41. "A receiver, as an officer of the court appointing him, is required to account to the court for the receipts and disbursements of all money and property received by him as receiver." 45 Am. Jur., Receivers, § 336, p. 271.

The receiver made a full and complete report of his receipts and disbursements for the period from December 12, 1955, to June 12, 1956, to this court and we approved the same on June 30, 1956. The receiver subsequently, after this cause had been returned to the district court for Douglas county, made reports to that court for the periods from June 12, 1956, to December 31, 1956; from January 1, 1957, to June 30, 1957; and from July 1, 1957, to November 12, 1957. As stated in 45 Am. Jur., Receivers, § 339, p. 272: "As it is the duty of the receiver to account to the court whose officer he is, so there is the correlative duty to examine and rule upon the account." We have examined all the reports of the receiver covering the period from December 12, 1955, to November 12, 1957, together with the oral and documentary proof offered in support thereof, and find the same to be a full, complete, and accurate report by the receiver of all money received and disbursed by him and the same are approved and allowed.

The receiver provided the necessary facilities and help to conduct the receivership. In connection therewith his disbursements show that he expended, up to November 12, 1957, the sum of $24,165.33 for this purpose. These expenditures covered such items as rent, lights, telephone, and stenographic, clerical, and miscellaneous help. In State v. Nebraska Savings & Exchange Bank, *supra*, we said: "The one question is whether the receipts and expenditures by the receiver are in ac-

cordance with the directions of the court and in conformity with the law in the accomplishment of the purposes for which the receiver was appointed." We think these expenses were necessary to carry out the purpose for which the receivership was created and being reasonable in amount the same are approved.

The trial court allowed the receiver total fees of $28,000 to cover his services for the period from December 12, 1955, to November 12, 1957, or 23 months. This included the sum of $7,000 allowed the receiver as an interim fee by this court. As of February 23, 1956, the receiver retained counsel and for his services from that date to November 12, 1957, the trial court allowed the receiver the sum of $15,620. The receiver contends these fees are inadequate for the services rendered.

Compensation of a receiver should be fixed at an amount that will be fair and reasonable for the services rendered and the question as to what is fair and reasonable is always one of fact in each case. As stated in 45 Am. Jur., Receivers, § 288, p. 223: "While the amount of the allowance for costs, expenses, compensation, and fees, involved in a receivership, lies in the sound discretion of the court in which receivership proceedings occur, such allowance should be reasonable according to the circumstances of the case." Ordinarily the compensation should not be greater than what would be reasonable compensation for doing the same amount and character of work if employed in the usual course of private business. As we said in State v. Nebraska Savings & Exchange Bank, *supra:* "As to the compensation to be allowed the receiver for his services, this is a matter largely in the discretion of the court having charge of the receivership; and unless it be made to appear affirmatively that the amount allowed is erroneous and there has been an abuse of discretion in the action taken in approving the report, it will not for that reason be reversed." See, also, Jacobs v. Ringling Brothers-Barnum & Bailey C. Shows, 141 Conn. 86, 103 A. 2d 805. As

therein stated: "They must be fixed at an amount that will be reasonable and fair compensation for the services rendered."

In fixing such compensation, as stated in Jacobs v. Ringling Brothers-Barnum & Bailey C. Shows, *supra:* "Certain recognized factors enter into the determination. Consideration should be given to the nature, extent and value of the property administered. * * * The complications and difficulties encountered should be noted. * * * The responsibilities involved, and assumed by the receiver, and the diligence and thoroughness which he displays are weighty elements. * * * The knowledge, experience, labor and skill required of the receiver and devoted by him to the receivership must be taken into account. * * * Then, too, the time properly required to be spent is an important consideration. * * * The amount paid as compensation for similar services should also be regarded." See, also, Mursener v. Forte, 186 Or. 253, 205 P. 2d 568; Hudson v. Hubbell, 171 Okl. 201, 41 P. 2d 844. As stated in 45 Am. Jur., Receivers, § 288, p. 224: "The considerations which should control in fixing the compensation are the value of the property in controversy; the particular benefit derived from the receiver's efforts and attention; time, labor, and skill required, and experience in the proper performance of the duties imposed; their fair value measured by common business standards; and the degree of integrity and dispatch with which the work of the receivership is conducted."

The burden is upon the receiver to prove the worth of his services. Jacobs v. Ringling Brothers-Barnum & Bailey C. Shows, *supra;* Woods v. City Nat. Bank & Trust Co., 312 U. S. 262, 61 S. Ct. 493, 85 L. E. 820. However, "In making such allowance the court is not confined to evidence formally introduced, in respect to the matter, but may act on his own knowledge and judgment as to the reasonableness of the charge in connection with what has been done by the receiver in dis-

charge of the duties of his receivership, and the nature, extent and value of the services rendered." State v. Nebraska Savings & Exchange Bank, *supra*. See, also, Mortimer v. Pacific States Savings & Loan Co., 62 Nev. 147, 145 P. 2d 733.

The receiver was appointed under and pursuant to section 45-157, R. R. S. 1943, which provides, insofar as here material, as follows: "Such receiver, when so appointed and qualified, shall have such powers and duties as to custody, collection, administration, winding up and liquidation of such property and business as shall, from time to time, be conferred upon the said receiver by the court." We have already set forth the order of this court which sets out the powers conferred upon the receiver.

As to the form of compensation to be paid a receiver section 25-1092, R. R. S. 1943, provides: "Receivers shall receive for their services such compensation as the court may award, subject to the following restrictions: (1) Receivers appointed for the purpose of preserving and protecting property pending litigation, or for the purpose of continuing the business of the debtor or corporation pending litigation, or when financially embarrassed, may be awarded a salary or lump sum; (2) Receivers appointed for the purpose of winding up the affairs of a debtor or corporation, reducing the assets to cash and distributing them, shall be awarded as compensation for such services a percentage upon the cash received and properly accounted for by them, which percentage may be increased where extraordinary services have been performed, and correspondingly reduced where the services have not been meritoriously performed."

It is the appellees' contention that the receiver was appointed for the purpose of preserving and protecting property pendente lite and therefore he should be awarded fees in the form of a salary or lump sum whereas the receiver, although admitting the receiver-

ship had its inception for that purpose, contends it actually turned into a liquidating receivership and, because of that fact, he should be allowed a fee based upon a percentage of the cash he has received and accounted for.

The receiver was primarily appointed for the purpose of preserving and protecting the property seized pending the outcome of this litigation and therefore within subsection (1) of section 25-1092, R. R. S. 1943. However, because of the duration of the litigation, the receivership has developed some of the characteristics of the situation intended to be covered by subsection (2) thereof. Under this dual situation we shall allow such fees for the receiver as we think are fair and reasonable.

The receiver offered both oral and documentary proof which detailed at great length the duties he performed, the nature and extent thereof, and the responsibility he had, and will have, in connection therewith. This evidence establishes that at the beginning the receiver had a difficult and burdensome problem in seeking to establish a satisfactory method for handling the accounts so as to be able to efficiently operate the collection thereof, and that this burden continued for many months. However, the evidence shows that this work materially decreased during the latter part of the 23 months herein involved, for on November 12, 1957, there were only slightly over 100 of these active accounts unpaid and some of them were tied up in litigation. While the work was burdensome and time consuming it was primarily of a ministerial character and clerical in form. No affirmative legal action was ever taken to collect any of the accounts. Payments were all voluntarily made although it is apparent the receiver spent a great deal of time urging the payment of all accounts and, as a result, a good job of collecting was done. As to any legal matters involved the receiver obtained legal counsel to advise him in regard thereto and to handle all such matters for him.

The receiver also offered the evidence of himself and three other qualified witnesses as to what his services were reasonably worth.

While such evidence is of value in aiding the court to arrive at what is a fair and reasonable fee, and we shall consider it for that purpose, however, in making such allowance, we are not confined solely to the evidence formally introduced but may properly act on our own knowledge and judgment as to the reasonableness of any fee to be allowed in connection with the work that has been performed by the receiver in the discharge of his duties, together with the nature, extent, and value thereof. See State v. Nebraska Savings & Exchange Bank, *supra*.

Viewed in the light of the foregoing principles, the evidence introduced and our knowledge of the kind and extent of the work performed and responsibility assumed we think the fee of $28,000 allowed the receiver for the work he performed from December 12, 1955, up to November 12, 1957, is a fair and reasonable compensation therefor.

Reasonable fees for necessary legal services performed by attorneys for a receiver may be properly allowed as an expense of a receivership. State ex rel. Sorensen v. Ralston State Bank, 125 Neb. 245, 249 N. W. 615; State ex rel. Sorensen v. First State Bank of Bethany, 123 Neb. 620, 243 N. W. 877. "A reasonable attorney fee in any proceeding is to be determined by the nature of the case, the amount involved in the controversy, the results obtained, and the services actually performed therein, including the length of time necessarily spent in the case, the care and diligence exhibited, and the character and standing of the attorneys concerned." Strasser v. Strasser, 153 Neb. 288, 44 N. W. 2d 508. See, also, Hardy v. Hardy, 161 Neb. 175, 72 N. W. 2d 902; Scully v. Scully, 162 Neb. 368, 76 N. W. 2d 239. As stated in State ex rel. Sorensen v. Ralston State Bank, *supra:* "Reasonable fees for necessary services

performed by attorneys for the receiver * * * may be allowed as an expense of the receivership." As stated in Mortimer v. Pacific States Savings & Loan Co., *supra:* "In finding the reasonable value of a receiver's or his attorney's fees, the elements to be considered as controlling are fairly well stated in United States v. Admiral Refining Co., Tex. Civ. App., 146 S. W. 2d 830, 831, cited by plaintiff: 'The considerations that should be controlling with the court in fixing compensation are the value of the property in controversy; the practical benefits derived from the receiver's efforts and attention; time, labor and skill needed or expended in proper performance of the duties imposed, and their value measured by the common business standards; and the degree of activity, integrity, and dispatch with which the work of the receivership is conducted.' * * * The measures to be weighed in fixing attorney's fees in receivership proceedings are, to a large extent, the same which are considered in fixing the receiver's fees. In fixing the allowances to either, the governing principle is that the compensation so allowed should be measured by the reasonable value of their services rendered."

The attorney for the receiver testified in detail as to the extent, nature, and character of the services rendered to the receiver since he was employed by him on February 23, 1956, up to November 12, 1957. He detailed the number of office hours used for that purpose, the work he performed directly in the receivership, the number and type of cases in which he appeared for and filed pleadings in behalf of the receiver, and the number of days he spent in court in connection therewith. He then testified as to what he considered to be the fair and reasonable value thereof. He also offered the testimony of two qualified witnesses as to what they considered his services to be worth. As stated in 5 Am. Jur., Attorneys at Law, § 192, p. 377: "The opinion evidence of expert witnesses, as to the

value of an attorney's services, is not conclusive or binding * * * on the court * * *. Such evidence is to be taken into consideration, with all the other evidence in the case, in arriving at a conclusion as to the just value of the services performed." And, as stated in 45 Am. Jur., Receivers, § 288, p. 223: "Evidence thereof is admissible if necessary for the information of the court, but where the court has personal knowledge of all that has been done by the attorneys, it is not always necessary to hear evidence respecting the amount to be allowed them. The court is presumed to know the value of attorneys' services, and it is for its own enlightenment that such evidence is heard." See, also, 5 Am. Jur., Attorneys at Law, § 190, p. 376.

We have considered the evidence adduced and, in light of the foregoing principles, have come to the conclusion that the amount allowed the receiver for attorney fees in the sum of $15,620 is a fair and reasonable value of the services performed by the receiver's attorney from February 23, 1956, to November 12, 1957.

The receiver has raised a question as to the payment of expenses and the allowance of fees for work and services performed in connection with the receivership subsequent to November 12, 1957, and that which will be performed up until the receivership is terminated. Of course all reasonable expenses necessarily incurred by the receiver in connection with the administration of the receivership on and after November 12, 1957, are hereby authorized and, if such, should be allowed and approved by the trial court when the receiver files his final report in that court. It is apparent the work of the receiver, since November 12, 1957, could not have been very heavy or difficult because of the limited number of unpaid active accounts remaining in his possession as of that date. However, he will have considerable work to perform in connection with the closing thereof. For this purpose we allow an additional fee of $12,000 so that the total fee to be received by the receiver shall

be $40,000. The receiver will have need of legal counsel during this period of time and for that purpose we allow him an additional $4,380 or a total fee for legal services of $20,000. It should be understood that these additional fees are to cover all ordinary services of the receiver and his counsel in connection with the receivership from November 12, 1957, up to and including the closing thereof. If extraordinary and unusual services are required in connection therewith the receiver may apply to the district court for additional compensation to cover such services.

As already stated herein it is our purpose to place the debtors whose contracts have been declared void in status quo. Consequently it would not be proper to charge them with any part of the costs of this receivership. On the other hand the necessity for our having to appoint a receiver was brought about by Associates. We therefore charge all the costs of this litigation to Associates which costs include the fee of $40,000 allowed the receiver, the fee of $20,000 allowed the receiver for his attorney, the $24,165.33 allowed as costs of administration, and such additional administrative costs and fees as the trial court may approve and allow upon final report of the receiver. The receiver is directed to pay all costs out of any funds of Associates in his possession, and if that be insufficient, to hold any of the contracts which we have herein directed to be returned to Associates until such costs are paid.

It appears that the amount charged by the reporter for preparing the bill of exceptions is far in excess of that authorized by statute. See, § 24-342, R. S. Supp., 1957; Pueppka v. Iowa Mutual Ins. Co., on rehearing, 166 Neb. 203, 88 N. W. 2d 657. We direct the district court, whose duty it is to tax the cost of preparing the bill of exceptions against the unsuccessful party in the final determination of the litigation, to not allow in excess of the amount authorized by statute when doing so. Pettis v. Green River Asphalt Co., on rehearing, 71 Neb.

519, 101 N. W. 333. When the amount that may be properly charged and taxed for preparing the bill of exceptions has been correctly determined the reporter should be directed to refund to the state, whom the record shows has paid the reporter, all amounts it has paid him in excess thereof.

In view of what we have herein held we reverse the judgment of the district court and remand this cause to it with directions to render such judgment as will fully and completely carry out the holding of this court as set out in our opinion and authorize it to terminate the receivership after the purpose for which it was established has been fully carried out and completed.

REVERSED AND REMANDED WITH DIRECTIONS.