ELVIN E. HILLS ET AL., APPELLEES, V. EARLE M. BURNETT, SR., DOING BUSINESS AS BURNETT'S HOME TRAILER SALES, ET AL., APPELLEES, IMPLEADED WITH THE MICHIGAN NATIONAL BANK, A CORPORATION, APPELLANT.

109 N. W. 2d 739

Filed June 16, 1961. No. 34923.

*Frank B. Morrison, Healey, Wilson & Barlow,* and *Patrick W. Healey,* for appellant.

*Nelson, Harding & Acklie* and *Donald E. Leonard,* for appellees Hills et al.

*William F. Matschullat* and *Charles W. Phillips,* for appellees Burnett et al.

Heard before SIMMONS, C. J., MESSMORE, YEAGER, BOSLAUGH, and BROWER, JJ.

SIMMONS, C. J.

This is an action in which plaintiffs seek to have a conditional sales contract and a promissory note declared null and void and released of record; to require defendants to deliver to plaintiffs a certificate of title to a mobile home involved; to restrain and enjoin defendants from attempting to collect on the loan; and to recover judgment for payments made.

The trial court found generally for the plaintiffs, decreed generally in accord with their petition, and rendered judgment against the Michigan National Bank for payments made to it in the sum of $369.44.

The plaintiffs are husband and wife and will be referred to herein as such except on occasion the husband will be referred to as Elvin. The defendants are corporations and individuals, who will be later named herein. The Michigan National Bank, a Michigan corporation, is the sole appellant. It will be referred to herein as the Bank.

The Bank by argument here presents the following contentions: (1) It is not a foreign corporation within the meaning of section 21-1201, R. S. Supp., 1959, as defined in section 21-1202, R. R. S. 1943, and hence not subject to service as provided therein; (2) that as a national banking association established in the State

of Michigan, it can only be sued in the district where established or in the state or municipal courts in the county where it is located; (3) that the transaction involved here did not involve usury; and (4) that if it did, the penalty applicable is a recovery back of twice the amount of interest paid and a forfeiture of all interest not yet paid. These contentions will be discussed in detail in the order stated.

We affirm the judgment of the trial court.

Section 21-1201, R. S. Supp., 1959, provides for service upon a foreign corporation. It is conceded that the service was properly made if the Bank is such a "foreign corporation" as defined in such act. The question is one of legislative intent. Section 21-1202, R. R. S. 1943, as it was when the service here had was made, is as follows: " 'Foreign corporations,' as the term is used in section 21-1201, shall embrace and include all corporations organized under the laws of any foreign government, of any other state than the State of Nebraska, and of any territory thereof, including the District of Columbia."

The contention of the Bank is that the government of the United States is not a "foreign government," as used in the act. If that be true, then it follows that the Legislature intended to include as a foreign corporation those organized under any government other than the government of the United States and the State of Nebraska; to exclude those organized under the laws of any territorial government of the United States; to include all others organized under territorial laws anywhere in the world; and to include corporations organized under the laws of the District of Columbia, although the District of Columbia is exclusively under the control of the government of the United States.

A study of the history of the act and its predecessor negatives any such irrational conclusion.

The Legislature in 1907 passed an independent act providing for service of process upon foreign corpora-

tions. Laws 1907, c. 32, p. 162. It provided in section 6 that: "This act shall be construed to be cumulative and shall in no way limit or restrict any method of obtaining service upon the corporations mentioned in this act now authorized by law but shall be in addition thereto."

The 1907 act defined a foreign corporation as "* * * every * * * corporation * * * organized or incorporated under the laws of any government *than the government of the United States,* or the laws of any state other than this state, except insurance companies, and except railroad companies, * * *." Laws 1907, c. 32, § 1, p. 162. (Emphasis supplied.) It appears clear that there was a legislative intent to except corporations organized under the laws of the government of the United States.

In 1909 the Legislature repealed the 1907 act and adopted a new act in its entirety and again provided that its provisions were cumulative as it had before. Laws 1909, c. 28, p. 206.

It defined a foreign corporation substantially as now defined in section 21-1202, R. R. S. 1943. Notably it left out any exception to corporations organized under the laws of the United States and added thereto the provision including territories and the District of Columbia.

In Eversole v. Eversole, 169 Ky. 793, 185 S. W. 487, L. R. A. 1916E 593, the rule is stated that: "Where a statute is amended or re-enacted in different language, it will not be presumed that the difference between the two statutes was due to oversight or inadvertence on the part of the legislature. On the contrary, it will be presumed that the language was intentionally changed for the purpose of effecting a change in the law itself."

In Hurley v. Brotherhood of R. R. Trainmen, 147 Neb. 781, 25 N. W. 2d 29, we reaffirmed this rule: " 'In considering an amendatory or substituted statute, it is proper to consider the provisions of the law which was repealed in connection with the law which takes its place,

in order to ascertain the legislative intent, and all provisions of the original statute which are not carried forward into or repeated in the new law are annulled by the repealing statute.' "

It is clear that the exemption of the government of the United States from the 1909 act shows a clear legislative intent to include corporations organized under laws of the government of the United States within the classification of foreign corporations and makes them amenable to service of process under section 21-1201, R. S. Supp., 1959.

This conclusion is reinforced by definitions found in the general corporation act passed in 1941. Laws 1941, c. 41, § 1, p. 158. It defines as follows: "* * * (1) 'domestic corporation' means a corporation organized under the laws of this state; (2) 'foreign corporation' includes every corporation not organized under the laws of this state; * * *."

Section 21-1201, R. R. S. 1943, was amended in 1955 (Laws 1955, c. 62, § 2, p. 197), prior to the service here involved and subsequent to the definitions above set out, was included in the general corporation act, and provided in certain contingencies for service upon the Secretary of State.

We find no merit to the Bank's assignment of error above discussed.

Title 12 U. S. C. A., § 94, p. 442, provides: "Actions and proceedings against any association under this chapter may be had in any district or Territorial court of the United States held within the district in which such association may be established, or in any State, county, or municipal court in the county or city in which said association is located having jurisdiction in similar cases."

The Bank contends that the trial court was without jurisdiction of the subject matter under the above provision. It contends that the proper venue of an action or proceeding against a national banking association

under the above statute is in the United States District Courts within the district or the state courts of the county or city where the bank is located. Stated otherwise, while asserting the right to transact business anywhere, it insists it can claim sanctuary from suit except in the restricted area defined by statute.

The Bank furnishes here an extended analysis of many decisions which it asserts sustain its claim of sanctuary under the above statute.

We do not deem it necessary to here analyze these decisions.

In 7 Am. Jur., Banks, § 820, p. 591, is stated the following rule: "The National Bank Act provides that actions and proceedings against any association under that act may be had in any Circuit, District or Territorial Court of the United States, held within the district in which such association may be established, or in any state, county, or municipal court in the county or city in which said association is located, having jurisdiction in similar cases. A majority of the state courts have held that these provisions do not deprive the state courts of jurisdiction of an action against a national bank located and doing business in another state, or in a county or city other than that in which the action is brought. * * * The minority rule is that a national bank may not be sued without its consent outside the county or city in which it is located. Even under this view, however, the exemption of national banks from suit in other than the county or city in which such associations are located is deemed to be a personal privilege prescribed for the convenience of such institutions and to prevent the interruption in their business that might result from their books being sent to distant counties in obedience to process from state courts."

The same rules are stated in Annotation, 86 A. L. R. 47, and following.

The rule is stated in 9 C. J. S., Banks and Banking, § 726, p. 1280, that: "In general, questions as to jurdisdic-

tion and venue in actions against national banks are dependent on rules of general application in civil actions and are not controlled by the character of the bank as a national corporation.

"Under the federal statutes, so far as civil actions by or against national banks are concerned, the state and the federal courts have concurrent jurisdiction, and questions as to state or federal jurisdiction in any particular case or the jurisdiction of particular state courts are governed ordinarily by the same considerations as govern with respect to any other action, the character of the bank as a national corporation having no bearing on the question. Moreover, the effect of federal statutes providing that actions against national banks may be had, as regards federal courts, in the district where the particular bank is established, or, as regards state courts, in the state, county, or city where the bank is located, has been held primarily to confer jurisdiction on the courts specified. As regards the venue of actions brought against national banks, such statutes are held to be permissive rather than mandatory, are applicable to transitory rather than local actions, and do not apply to cases wherein a national bank has become a joint party as an incident to the enforcement of an equitable or legal right. There are, nevertheless, cases which hold that, under the provisions of the federal statutes in question, in order to maintain actions against national banks, such actions must be brought in the place where the bank is located or the district where the bank is established, depending on whether the particular action is brought in a state or a federal court."

A wealth of cases is cited under Title 12 U. S. C. A., § 94, p. 445.

The Bank here admits that it has been doing business in Nebraska. The evidence shows that it has over the years purchased between three and four million dollars worth of paper, similar to that here involved, from one or more of the defendants or their corporations. It has

not complied with our laws in so doing.

The cause of action upon which plaintiffs sue arose in this state. Some of the defendants are residents of this state. Most of them were personally served in this state. The action is one that seeks to enforce provisions of state laws.

The conditional sales contract here involved provides that: "It is the intention of the parties hereto that all matters relating to the execution, interpretation, validity and performance of this contract shall be governed by the laws of the state in which the Buyer now resides, which is the state indicated below." The contract shows that the buyer was a resident of Nebraska.

The reason given in some of the cases relied on by the Bank for construing the permissive "may" of Title 12 U. S. C. A., § 94, p. 442, as mandatory as being necessary to prevent the interruption of the Bank's business by having its books and records sent to distant places, has little if any application here. In fact the Bank's witness testified that it repeatedly sent representatives into this state to enforce collection of contracts such as are involved here.

In Council Bluffs Canning Co. v. Omaha Tinware Mfg. Co., 49 Neb. 537, 68 N. W. 929, we held that: "Where a foreign corporation has business transactions in this state with citizens and residents of the state, out of which arise accounts or claims against the corporation, such accounts or claims may be enforced in the courts of this state if jurisdiction can be obtained by legal service of process."

In discussing this matter we said: "* * * it may be said that the company, plaintiff in error, was an Iowa corporation; that the evidence adduced at the hearing on the objections to the jurisdiction of the court, although conflicting, was amply sufficient to sustain the finding that the contract, from which arose the claim involved herein, was a Nebraska contract, a business transaction of the foreign corporation, within this state, and fur-

ther, that it was engaged in other and further acts in this state, directly within its province as a corporation. By so doing it brought itself within the state and subject to the jurisdiction of the courts of Nebraska, and subject to their process, at least in actions growing out of such affairs. By the transactions of the corporation, including the one out of which arose the claim on which this action is based, the corporation was sufficiently engaged in business in this state to be amenable to the jurisdiction of its courts and subject to the process thereof when legally served, at least in an action for the recovery of the account, the result of such business."

We have followed that rule as late as Pitzer v. Stifel, Nicolaus & Co., 143 Neb. 394, 9 N. W. 2d 495.

We see no reason why, nor do we conceive that the Congress intended, that a national bank should be permitted to go into a state not of its location, transact business, seek the protection and benefit of its laws, and then be granted full immunity from suit except in the small sanctuary as defined in Title 12 U. S. C. A., § 94, p. 442.

We follow the majority rule and the plain import of our own decisions, and hold that the Bank is subject to suit in Nebraska under the conditions existing here. Any other decision would be a patent injustice.

The Bank next contends that the sale here involved was a good faith time sale and valid.

It becomes necessary now to state the facts somewhat in detail as we find them to be without substantial dispute in the record.

Plaintiff Elvin E. Hills was a young man stationed at the airbase near Lincoln, Nebraska. His wife was a student in a beautician school.

The defendants Burnett, father and son, controlled two corporations and at times did business under names not the same as the names of the corporations. It is sufficient to say that the son handled the sales at a place of business on one of the highways near or within the

city of Lincoln under the name of Tad's Home Trailer Sales. Mr. Burnett, Sr., operated out of a downtown office and handled the sale of paper taken in payment at the sales lot. Such at least was the way this transaction was handled.

Tad's Home Trailer Sales advertised trailers or mobile homes for rent. Plaintiff Elvin went to the lot to look at rentable trailers. He was told that at that time it did not have trailers for rent but did have used and new trailers for sale. Elvin looked at them. He found one which he thought suited his needs and was quoted a cash price of $3,995, plus $5 for a credit check. He was asked how much he could pay down and responded "about two hundred dollars." The salesman responded that he thought that would be sufficient to put him in possession of the trailer. He asked about the payment of the balance and was told that would be financed at the normal bank rate of 6 percent. Elvin then went downtown, got his wife, and she examined the trailer and approved the purchase. Elvin then made by check a payment of $200 to Tad's Trailer Sales, and signed in blank what he understood to be a "credit reference" but which was in fact a conditional sales contract. Elvin was told that if he desired to do so before the contract was completed, the $200 would be returned to him. Up to this point it seems perfectly clear that no mention was made of other than a cash price.

These events occurred at or before the noon hour. Mr. Burnett, Jr., endorsed and cashed the check that afternoon.

About 5 p.m. plaintiffs returned to the sales lot. They were told that their credit report was favorable. They were required to wait until a clerk in the office prepared the necessary papers.

Finally they were presented with a series of papers to which they were told in effect to "sign here."

In the order in which offered in evidence they were as follows: Exhibit A is a "Conditional Sales Contract."

The blanks were filled in on a typewriter. This showed (1) a "Cash Selling Price" of $4,000; (2) insurance, $250; (3) a "Down Payment" of $1,200 (this will be explained later herein); (4) unpaid balance of purchase price, $3,050; (5) finance charge, $915; (6) a "Deferred" balance of $3,965; and (7) payable in 60 equal installments of $66.10 a month. This figured up to $3,966 instead of $3,965. Here we point out that none of the defendants was licensed to engage in business under the Installment Loan Act, sections 45-114 to 45-158, R. R. S. 1943.

Exhibit B is the insurance policy written through the agency of Mr. Burnett, Sr. It shows the purchase price to be $4,000 with loss payable to the Bank.

Exhibit C is the promissory note for $3,965, payable to Burnett's Home Trailer Sales at the Bank's place of business in Michigan.

We noted that we would explain the $1,200 downpayment recited above. Of that sum $200 was paid by the check above referred to. The balance was a promissory note payable on demand to Mr. Burnett, Sr., with interest at the rate of 6% per annum and at 9% after maturity. No mention had been made of this $1,000 note until the evening session. Incidentally there is in evidence a letter dated November 3, 1959, from the trustee of "Tad's Enterprises, Inc." for the payment of this $1,000 note. As noted above this note was payable to Mr. Burnett, Sr., "or order." It shows no endorsement.

Exhibit E is a "Statement of Delivery" directed to the Bank. It recites a "purchase price" of $4,000, a "Cash" payment of $1,200, and a recital that the plaintiffs were to pay 60 monthly installments of $66.10. It is signed only by Elvin. On the basis of this instrument alone, it can be calculated that the plaintiffs were to pay a total of $3,966 on a $2,800 debt.

Exhibit G is defined in the form as an "Irrevocable Application to Purchase." Plaintiff Elvin testified that he signed such an instrument in blank. The exhibit shows typewritten entries including "Total purchase

price to be paid" of $4,000 and other entries similar to those above recited in the conditional sales contract.

Exhibit L is a "Michigan National Bank Customer's Statement" signed by the plaintiffs and giving credit references. Description of the "article" purchased recites the "Cash Delivered Price" of $4,000, and the other figures involved in the conditional sales contract by which a "Deferred Balance" of $3,965 is shown payable at $66.10 per month for 60 months. The evidence is that this exhibit is one which was submitted to the Bank and considered by it in making the purchase of these contracts. It is on a form submitted to dealers and required by the Bank. Likewise the "Statement of Delivery," exhibit E, is on a form submitted by the Bank and required by it. Likewise the promissory note for $3,965 is on a form prepared by the Bank and furnished to its dealers.

Exhibit M is a carbon copy typewritten form which recites that Elvin had been offered a time sales price of $5,165 and a cash price of $4,000 and had rejected the cash sale price. Here it appears that Burnett's office force was careful to have Elvin fill in the blanks by himself, although it is patent that he wrote in things such as the remainder was payable "to Michigan National Bank" and a description of the trailer by serial number, etc. On all the other forms a clerk of the seller filled in all blanks on the typewriter. The above is the only reference we find in the record to a time sales price being quoted. We see in it nothing but a subterfuge to meet the time sale-cash sale rule.

The evidence is that the conditional sales contract, the promissory note for $3,965, the promissory note for $1,000, the customer's statement, and the election not to purchase for cash were all typed in the late afternoon before plaintiffs were called in to sign.

The plaintiffs were called in to sign and refused. Plaintiff Elvin complained that he had not been told about any $1,000 side note to Mr. Burnett. He asked for

the return of the $200 he had paid and it was refused. He then called his noncommissioned officer superior at the base, who had recommended the Burnett place to him, and he came to the sales lot. The friend recommended that he and his wife sign the papers, which he and his wife did.

It is the above transaction that we are asked to approve as a good faith time price sale after an "opportunity" to choose between a cash price and a time price.

After the plaintiffs refused to sign the papers and asked for a return of their deposit and that request was refused, their "choice" lay between losing $200 of their money or submitting to the demands of the defendant Burnett.

In McNish v. General Credit Corp., 164 Neb. 526, 83 N. W. 2d 1, we held that: "In cases of this character courts will look through the form to the substance of the transaction in order to determine whether there was a bona fide time sale or a loan."

Particular reference may be made to our holding in the McNish case about a borrower in chains. See, also, Robb v. Central Credit Corp., 169 Neb. 505, 100 N. W. 2d 57.

In McNish v. General Credit Corp., *supra,* we held that: "A truck dealer may in good faith sell a truck on time for a price in excess of the cash price without tainting the transaction with usury, even though the difference in the two prices may exceed lawful interest for a loan. * * * A time sale made in good faith at a price in excess of a cash price, which time price is arrived at by schedules furnished by a finance company which solicits contracts so entered into between a purchaser and a dealer, may not be regarded as being tainted with usury, even though the difference exceeds the lawful interest for a loan. * * * In order to have the foregoing principles apply it must appear that the buyer actually was informed of and had the opportunity to choose between a time sale price and a cash sale price.

It is not enough to merely show that the instruments signed evidencing the indebtedness refer to a time price or time differential when, in fact, the buyer was never quoted a time sale price as such."

These rules were followed again in Robb v. Central Credit Corp., *supra,* wherein we added: "It is not a time sale if a car dealer, in selling a car, actually agrees with the buyer that he will finance the balance of the cash purchase price agreed upon, and does so, even though at the time he informs the buyer of the amount he will be required to pay and the terms thereof. Such a transaction would be a loan to finance the balance of the cash purchase price and, if payable in installments, must meet the requirements of the statutes relating thereto. And the fact that the buyer knew the terms and provisions of such loan at the time it was made and voluntarily entered into it would not have the effect of waiving the illegality of any provision thereof, if such provision was actually in violation of any of the inhibitory provisions of the installment loan statute. See State ex rel. Beck v. Associates Discount Corp., 168 Neb. 298, 96 N. W. 2d 55."

We find no merit in the contention of the Bank above examined.

Finally the Bank contends that even if we hold against its other contentions that under the provisions of Title 12 U. S. C. A., § 86, p. 319, the penalty is the loss of all interest to accrue and the recovery against it of twice the interest paid.

In its original brief here the contention is advanced in this language: "* * * if the transaction is considered a direct loan from the bank rather than a time sale, so as to hold the bank to have participated in a scheme, device or artifice to take usury, then it is error to impose a penalty greater than that provided by the controlling federal statute—forfeiture of all interest due and recovery of twice the interest paid."

In its reply brief it states its position in this lan-

guage: "If the Court strike down this transaction, it apparently must be done on the basis of a holding that the transaction amounted to a 'direct loan' from the bank to the purchasers. It is, of course, to The Michigan National Bank that the note is made payable, and the purchase statement contemplates that the time balance to be paid to The Michigan National Bank. This is, so the Bank contends, merely the manner in which the vendor's interest in the transaction is assigned and taken over by The Michigan National Bank.

"If, however, it should be held to be a direct loan, then it is plain that the penalties provided by 12 U. S. C. Section 86 are exclusive."

Implicit in these contentions is the premise that the note was "made payable" to the Bank and that the purchase statement contemplates that the time balance be paid to the Bank.

This is exactly contrary to the record. The note for $3,965 is made payable to Burnett's Home Trailer Sales at the office of the Bank in Grand Rapids, Michigan.

The Bank's witness here very explicitly stated that the Bank did not purchase the note and contract here involved until it had examined the same with the supporting papers. The premise upon which this argument rests is not in accord with this record.

The Bank here does not seem to recognize that this contract and promissory note were void from the inception of their delivery to Burnett. The sale of them to the Bank by Burnett does not and cannot breathe validity into them. The statutes of this state and our repeated decisions so provide.

We need cite only some of the latter decisions: Curtis v. Securities Acceptance Corp., 166 Neb. 815, 91 N. W. 2d 19; Thompson v. Commercial Credit Equipment Corp., 169 Neb. 377, 99 N. W. 2d 761.

Any other rule would open a wide door for the complete defeat of the Installment Loan Act and the public policy it serves. Any person, licensed or nonlicensed,

could then avoid the inhibitions and prohibitions of the act by the simple device of selling the void securities to a national bank.

The judgment of the district court is affirmed.

AFFIRMED.