RALPH E. WEAVERLING, APPELLEE, v. LOUIS W. MCLENNAN ET AL., APPELLEES: LINCOLN LIFE COMPANY, APPELLANT. LINCOLN LIFE COMPANY, APPELLANT, v. LOUIS W. MCLENNAN, APPELLEE.

FILED FEBRUARY 13, 1928. No. 25323.

Paul F. Good and Joseph S. Wishart, for appellant.

Frederick J. Patz, Sterling F. Mutz, J. W. Kinsinger, A. W. Richardson and Hall, Cline & Williams, contra.

Heard before GOSS, C. J., ROSE, DEAN, GOOD, THOMPSON and EBERLY, JJ.

EBERLY, J.

This action was commenced as an action in equity in the district court for Lancaster county, Nebraska, by Ralph E. Weaverling, whose pleadings designate Louis W. McLennan, the First National Bank of Lincoln, Nebraska, the First Trust Company of Lincoln, Nebraska, and the Lincoln Life Company, defendants. In this action Harriet P. Collman, as executrix of the last will and testament of O. Jansen Collman, deceased, intervenes, praying equitable relief against McLennan.

The Lincoln Life Company, a dissolved corporation, after the commencement of the above proceedings, likewise commenced a separate action against McLennan in the district court for Lancaster county, Nebraska. By stipulation of all parties in interest the district court consolidated the above actions in which issues had been properly joined, which thereafter proceeded to trial as an action in equity in which, speaking generally, the interests of all parties named above, excepting McLennan, were opposed to the interests which McLennan asserted as defendant. The decree entered by the district court, in so far as it was favorable to McLennan, was brought to this court for review by trial de novo by the Lincoln Life Company, who appears here as the sole appellant. This entire litigation, so far as now before us, had its sources in, and arose out of, the transaction covering the increase of the capital

stock of the appellant company in the month of April, 1920.

Previous to that time the Lincoln Life & Accident Company, subsequently known as the Lincoln Life Company, and hereinafter to be referred to as the insurance company, was engaged in a successful business in Lincoln, Nebraska. O. Jansen Collman was the general manager and director thereof, and due to control of stock and undoubted experience in the insurance business exercised a preponderating influence in its affairs. McLennan owned one share of stock, was superintendent of agents and agencies, and also, by grace of Collman, was a director of the company. The president of the company was not "active," as that term is understood in insurance circles, and the actual management of the company's affairs devolved largely, if not exclusively, on O. Jansen Collman.

During the spring of 1920 those then controlling the destiny of this insurance company became desirous of having it enter the insurance business in the state of Minnesota. In order to comply with the laws of that state, as a prerequisite to the commencement of business therein, it was necessary that the assets of the insurance company be substantially increased, and in view of circumstances detailed in the evidence it was deemed highly important that such increase be secured, and the right to carry on business in that state be acquired, not later than May 1, 1920.

The evidence in the record is practically undisputed, and indicates with reasonable certainty that the plan first adopted to secure the desired end contemplated (a) an increase of the capital stock by 1,202 shares; (b) that these shares should be sold at $300 a share prior to May 1, 1920; (c) that McLennan should be in charge of the selling campaign.

A considerable portion of the new stock had been sold under this plan when, unfortunately for the venture, the results of the general deflation of that year became evident. The result was to so chill sales that, when the latter part of April, 1920, arrived, it was patent that some 460 odd

shares of stock could not be then disposed of in the manner planned prior to May 1 ensuing. It is also patent that, when this emergency became apparent, a further agreement was entered into between the interested parties, but what the terms and conditions of that agreement were is a matter of dispute, and on it the evidence conflicts.

However, it is quite certain, and, in fact, without serious dispute in the evidence, that under the inspiration and leadership of Collman the unsold stock, so far as the stock register of the insurance company, at least, was concerned, was issued in substantially equal amounts to Collman and McLennan; that Collman with McLennan's assistance negotiated "loans" to the extent of $136,000 with various banks in Lincoln and vicinity. The ultimate agreements with these banks for these "loans" contained, contemplated, and provided for, at least, the following: That Collman and McLennan should execute individual notes bearing interest at 8 per cent. aggregating the amount named; that stock of the insurance company issued on that date was to be deposited as collateral to such loans; that this collateral so deposited was to be sold by the insurance company and its agencies as soon as possible; that the banks were to receive the proceeds of such sales; that the proceeds thus received were to be by the banks indorsed on the notes which the collateral secured; that the banks, in consideration of the notes received (made by Collman and McLennan), were to issue directly to the insurance company certificates of deposit of equal amount payable to it, bearing interest at the usual rate; that in addition the understanding was that the insurance company was to hold, and was not to cash, such certificates of deposit thus issued, and banks issuing same should be required to pay out nothing thereon, except to the extent that the note for which such certificate was issued thereafter was actually paid to the bank issuing the same; that the subsequent renewals of unpaid notes or unpaid portions thereof and unpaid certificates or unpaid portions thereof, which passing

time might necessitate, should be identical as to date, due date, and amount.

It seems that in carrying out this plan "loans" aggregating $136,000 were made, of which McLennan executed and delivered the following: First National Bank of Lincoln, Nebraska, $30,000; Lincoln State National Bank, $10,000; Elgin State Bank of Elgin, Nebraska, $24,000; Farmers State Bank of Dodge, Nebraska, $12,000; First National Bank of Lincoln, Nebraska, $20,000. This last named note was executed and delivered jointly with O. Jansen Collman. The total of these notes amounts to $96,000. There were issued to McLennan at this time by the insurance company 283 shares of stock, all of which, together with other shares of borrowed stock, were by him deposited as collateral security for the notes thus executed by him with the banks making the loans. The bank receiving the note advanced no cash thereon, but issued in lieu of cash certificates of deposit to the insurance company direct in an amount equivalent to the face of the notes received bearing the usual rate of interest, which certificates were then received by Collman in behalf of the insurance company and placed in its assets as "admitted assets." The insurance company, by proper authorities and after examination, was thereupon approved as having assets sufficient to enable it to do business in Minnesota, and as having properly increased its capital stock.

It also appears that some of the stock thus pledged was thereafter sold. The proceeds were turned over to the bank and by it credited on the notes secured by the stock so sold. The insurance company was then first permitted to withdraw the amounts equivalent to the shares thus received by the bank. And it also appears both the unpaid portions of the certificates as issued by the banks and notes executed by McLennan were renewed by the respective makers from time to time in identical amounts with identical face and date, and with identical maturities. In fact, the course of business contemplated by the agreements which preceded making the "loans" ap-

pears to have been observed by all parties as long as the insurance company was a going concern, except in one instance where O. Jansen Collman assumed authority, without concurrence of McLennan to abrogate it or modify it in part with the Lincoln State National Bank. Thereafter, Collman, the "moving spirit of the company," died.

In 1924 the surviving stockholders authorized the company to dispose of its business, which was done and the company voluntarily dissolved. It was and is perfectly solvent, and its affairs are now in the hands of the statutory trustees for liquidation. It appears that the assets for distribution among the stockholders will amount to $240 for each share of stock outstanding.

The present appeal now presented to this court involves an attempt on part of the interests opposing McLennan to compel the payment of the unpaid portions of the indebtedness originally represented by the $96,000 notes by McLennan as his personal obligation without recourse to the assets of the stockholders for indemnification. The latter, as his defense, and also as a basis for affirmative relief in this consolidated action, contends that the course of business hereinbefore recited was due to, and controlled by, an express agreement; that this agreement contained, in addition to the provisions which have actually and substantially been carried out by all the parties thereto, also as an essential part thereof, and as originally entered into by all parties thereto (including the insurance company) provisions which contemplated and provided that the transaction of which the $96,000 indebtedness formed a part, in its entirety, was but a loan of credit by McLennan to the insurance company; that all of said sums borrowed were for the benefit of it, and that it actually received the same; that this agreement also involved and contained an express agreement and understanding on part of the insurance company to fully indemnify this defendant and to save him harmless from any loss occasioned by the transaction before us; that the indebtedness created was in truth and

in fact the indebtedness of the insurance company; that the provisions of this contract requiring said indebtedness to be discharged by the proper application of the proceeds of the sale of stock pledged, and providing for the issuance of certificates of deposit by the banks with the agreement that such certificates should not be cashed by the insurance company until the notes or renewals thereof for which said certificates of deposit had been originally issued by the banks had been actually paid, were designed and intended to accomplish this desired end.

. With all and every part of this contention the appellant took issue in the court below. These propositions were submitted to the district judge on conflicting evidence largely oral in its character, and from the decision of that court sustaining the defendant's contention the insurance company appeals.

It is undoubtedly true when an action in equity is appealed, it is the duty of this court to try the issues *de novo*, and to reach an independent conclusion without reference to the findings of the district court. But when evidence on material issues so conflicts that it cannot be reconciled, this court will consider the fact that the trial court heard the witnesses and observed their manner of testifying, and must have accepted one version of the facts rather than the other. In this view of the case we find no difficulty in adopting as our independent conclusion the determination as to facts made by the trial court. *Greusel v. Payne,* 107 Neb. 84.

At this point we will consider the contention of the appellant that the law will not lend its aid to the party whose defense to an action is based on an illegal and immoral contract or agreement, or as tritely expressed, "He who comes into equity must come with clean hands." In the discussion of this proposition it is but fair to concede that the obvious purpose of all concerned in the transaction before us with reference to the increase of the capital stock of the insurance company; including the appellant as well as the defendant, was to substantially circumvent the re-

quirements of the state of Minnesota on the subject of admission of the company to do business in that state, and as a means to that end to deceive the insurance authorities of our state. But, it must be admitted that the deception itself was actually achieved by the appellant acting through its own officers of which Collman was the moving and controlling spirit who made use of the certificates of deposit.

The defendant herein, in the light of the accepted evidence of the record, occupied the relation to this situation which, for want of a better term, we will denominate as an accessory before the fact of deception. While it may be conceded that the plan actually followed was not intended to, and did not, so far as the record discloses, operate to the injury of the stockholders or of the insurance company, and may have indeed promoted the financial interest of both, it must be admitted that deception was contemplated and involved.

The effect of the now questioned transaction was to create a distinct fund evidenced by the certificates of deposit and their unpaid renewals. This fund is now in possession of the statutory trustees who, under the findings of this court, were and are chargeable with notice of the actual facts as to its source. They now seek to retain this fund for division among the surviving stockholders discharged of all obligations brought into being by its very creation.

However, in the present proceedings in which appellant trustees were of the moving parties, the powers of equity have been invoked and relief secured against the defendant as to causes of action growing out of, connected with, and identified as, part of the same questioned transaction. Under these circumstances is the maxim, "He who comes into equity must come with clean hands," applicable? May it properly be used to secure a denial to the defendant of equitable relief to which that portion of the questioned transaction plainly entitles him, and at the same time compel compliance with obligations which the same inseparable transaction imposes upon him? It would seem not.

The maxim quoted being founded on public policy, public policy may require its relaxation. Even when the parties have been found to be *in pari delicto,* relief has at times been awarded on the ground that in this particular case public policy has been found to be best conserved by that course. 21 C. J. 189, sec. 175. Rather, it would seem that the facts before us required the application of the well established principle: "Where equity has assumed to act, it must do complete justice, regardless of whether litigants originally came into court with unclean hands." *Wenzlaff v. Tripp State Bank,* 50 S. Dak. 6.

We have not overlooked the other assignments of error presented by appellant. However, we deem the principles announced herein as controlling so far as the contentions made are deemed material.

We therefore find that the findings and decree of the trial court are correct as to all material matters before us, and the judgment of the district court is

AFFIRMED.

Note—See Equity, 4 A. L. R. 63; 10 R. C. L. 393; 2 R. C. L. Supp. 1009; 5 R. C. L. Supp. 553; 21 C. J. 137 n. 24, 189 n. 68.