ERNEST R. LLOYD ET AL., APPELLEES, V. JOHN H. GUTGSELL, DOING BUSINESS AS JACK'S TRAILER SALES, APPELLEE, IMPLEADED WITH MOBILE HOME FINANCE COMPANY, A CORPORATION, APPELLANT.

124 N. W. 2d 198

Filed October 18, 1963.    No. 35465.

Crosby, Pansing, Guenzel & Binning and Donn E. Davis, for appellant.

Kerrigan, Line & Martin, for appellees Lloyd.

Paul E. Galter, for appellee Gutgsell.

Heard before CARTER, MESSMORE, YEAGER, SPENCER, BOSLAUGH, and BROWER, JJ.

SPENCER, J.

This is an action by Ernest R. Lloyd and Marion P. Lloyd, husband and wife, hereinafter referred to as plaintiffs, against John H. Gutgsell, doing business as Jack's Trailer Sales, and Mobile Home Finance Company, a foreign corporation with its home office at Drayton Plains, Michigan. The action seeks to cancel a conditional sales contract and a promissory note covering the purchase of a house trailer, for the return of the payments made, and to secure a certificate of title to the trailer free of encumbrance.

Judgment was entered for the plaintiffs. Only the defendant, Mobile Home Finance Company, has appealed to this court. It will hereinafter be referred to as defendant. Whenever it is necessary to mention the other defendant he will be referred to by his trade name, Jack's Trailer Sales.

About the first of September 1960, plaintiffs, desiring to purchase a Detroiter house trailer, went to Jack's Trailer Sales lot in Lincoln, Nebraska, and contacted one Able, a salesman for Jack's Trailer Sales. The exact trailer they wanted had to be specially ordered. A sales agreement was apparently drawn up and executed, but no copy of it was produced.

Plaintiffs were told that the cash price of the trailer they wanted was $4,500, and that $750 would be a suffi-

cient downpayment. Plaintiffs testified that they asked Able if they could finance the trailer anywhere they wanted, and he said yes, but that the company Jack's Trailer Sales financed trailers through would give plaintiffs the same rate as the bank. They also testified he said this rate would be 6 percent interest, and that the company did not have too much red tape about moving a trailer around. Able did not testify, so this testimony is undisputed.

The next conversation material to this transaction was on September 9, 1960, the day the trailer was delivered to the plaintiffs at Fremont, Nebraska. Ernest R. Lloyd testified that he called Lincoln to check on the delivery of the trailer, and was told that it was on the way. He was told that the driver was bringing the papers and that the price of the trailer had been raised $500 but that a $500 credit had been given, supposedly for some trade-in furniture. He testified he was told this was done so that it would go through the finance company more easily. There was no other conversation relative to financing the transaction. The sales contract, exhibit No. 1, brought up by the driver, was signed by the plaintiffs and delivered to the driver. It provides in part as follows:

"CONDITIONAL SALE CONTRACT

VENDOR    Jack's Trailer Sales   of   Lincoln, Nebraska
         (Print Name of Dealer)        (City)    (State)
VENDEE Ernest R. Lloyd - Marion P. Lloyd of A. C. Nel-
         (Print Purchaser's Name)
    sen Trailer Court,   Fremont,   Dodge,   Nebr
    (Street)   (City)   (Township)   (County)   (State)

"The undersigned Seller hereby sells, and the undersigned Buyer hereby purchases, subject to the terms and conditions herein set forth, the personal property described below, (hereinafter referred to as 'property'), delivery and acceptance of which, in good order, is hereby acknowledged by Buyer to-wit:

| New or Used | Make or Trade Name | Year | Length, Color and Model | Serial Number |
|---|---|---|---|---|
| New | Detroiter | 1960 | 51' Desert Rose & White | FJ-51-3FK-IOW- |
|  | MOBILE HOME |  | 51-3FK-10W-CA | CA-K-3628 |

Upon the following terms:

(1) Total Cash Price . . . . . . . $5000.00

(2) Down Payment Cash $750.00

Trade $500.00 . . . . $1250.00

(3) Unpaid Balance of Cash Price
(1 minus 2) . . . . . . . . $3750.00

(4) Cost of Insurance to Buyer . . . . $ 340.00

Insurance Coverage: [ ] $———— Fire and Theft

[ ] $———— Deductible Collision
[ ] Vendor's Single Int. and Emb't.
[ ] Life and Disability (Restricted)
For ———— months

(5) Other charges (Itemize) . . . . ————
. . . . . . . . . . . . . . $————

(6) Net Principal Balance Due
(3 plus 4 plus 5) . . . . . . . $4090.00

(7) Time Price Differential
(Finance and Service Charge) . . $1229.00

| AMOUNT OF NOTE |
|---|

—(8) TIME BALANCE OWED (6 plus 7) . $5319.00

(9) Time Selling Price (2 plus 8) . . . $6569.00

which time balance Buyer hereby promises and agrees to pay in 60 installment (s) of $88.65 and ———— installments of $———— each, payable on the October 15, 1960 day of each and every month hereafter, with interest at the highest lawful rate after maturity, as is evidenced by Buyer's note of even date herewith, * * *."

The promissory note is attached to the contract in such a manner that it could be detached by tearing a perforated line separating it from the contract, but this has not been done and it is still attached to the contract. Exhibit No. 1 is a form prepared and furnished to the dealer by the defendant. The name of the defendant does not appear in the body of the contract, but the promissory note is made payable at the office of Mobile Home Fi-

nance Company, 4615 Dixie Highway, Drayton Plains, Michigan. There is a printed assignment on the back of the contract as well as on the back of the note. Both of these run to the defendant and both of them were completed by the dealer under date of September 13, 1960. These indicate that it was contemplated that the financing was to be done by the defendant.

Defendant alleges five assignments of error, which we condense to the points argued in defendant's brief, as follows: Was the transaction a loan or a bona fide purchase on time; and, are the plaintiffs barred from equitable relief under the "clean hands" doctrine? Considering the last point first, it is true that the plaintiffs, at the time they signed the contract, knew that they were being given a fictitious credit for $500, but they also knew that this merely offset the inflated sales price. They were purchasing the trailer on the basis of the quoted $4,500 cash sale price.

The evidence is undisputed that the defendant is affiliated with the manufacturer of Detroiter Mobile Homes, and secures its finance business contacts through the manufacturer's representatives in the field. Defendant was peculiarly situated to know the actual value of the trailer. Its representative testified that defendant had a rule requiring a 25 percent downpayment but the maximum it would advance on the contract would be the invoice price of the unit plus freight. The invoice price was $3,759.10, and the freight was approximately $115. He further testified the defendant actually advanced $3,750 on this contract to Jack's Trailer Sales. Three thousand seven hundred fifty dollars was the exact balance of the quoted cash price. This would indicate that the $340 included for cost of insurance was not advanced by Jack's Trailer Sales but was loaned to the plaintiffs as a part of the transaction with the defendant. It was the defendant who was getting the benefit of the charges made for financing the cash price.

Defendant's representative testified it was not bound

to take all finance contracts on Detroiter trailers from Jack's Trailer Sales, but checked each one presented and took only those it wanted. It did take this one. Further, as noted, the promissory note was drawn payable at its place of business in Michigan.

This court has in the past refused to apply the so-called "clean hands" doctrine in usury cases against the borrower as a participant in a usurious transaction, on the theory that the borrower is in vinculis and not in pari delicto to the lender as regards the usury. State ex rel. Beck v. Associates Discount Corp., 162 Neb. 683, 77 N. W. 2d 215. This is not a new doctrine. It is found in the early English and American cases. In 1781, Lord Mansfield, in summing up to the jury in Lowe v. Waller, 2 Doug. 735, told it: "* * * the statute of usury was made to protect men who act with their eyes open; to protect them against themselves." This case and other English cases embracing the same point were followed in an opinion written by Chief Justice Marshall, in Scott v. Lloyd (1835), 34 U. S. 418, 9 L. Ed. 178. Chief Justice Marshall analyzed the English usury cases, some of which were in the form of sales rather than the loan of money, and concluded: "Yet, it is apparent, that if giving this form to the contract will afford a cover which conceals it from judicial investigation, the statute would become a dead letter. Courts, therefore, perceived the necessity of disregarding the form, and examining into the real nature of the transaction. If that be, in fact, a loan, no shift or devise will protect it." That is and has been the rule in this jurisdiction. To hold otherwise would make usury statutes a hollow mockery.

The same reasoning applies where the purchaser is merely a passive participant in an active misrepresentation by the seller. In this instance, the seller urged the plaintiffs to finance the transaction with the defendant, and the deal for the defendant was handled by the seller. Plaintiffs had no contact with any other

representative of the defendant until after the transaction was completed. Further, the defendant was in a better position than the plaintiffs to know the actual value of the trailer. Regardless of the price paid for it, defendant knew the invoice price was only $3,759.10. To hold the plaintiffs to be barred from raising the defense of usury in this case or in like situations would permit unscrupulous sellers to avoid the usury statute by a misstatement which in no way is initiated by or is actually beneficial to the purchaser.

We believe the rule to be applied in cases of this nature is the one set out in Weaverling v. McLennan, 116 Neb. 466, 217 N. W. 956: "The equitable principle expressed in the maxim, 'He who comes into equity must come with clean hands,' being founded on public policy, public policy may require its relaxation or limitation. Even when the parties have been found to be in pari delicto, relief has at times been awarded on the ground that in the particular case public policy has been deemed to be best conserved by that course."

The undisputed testimony of the plaintiffs as to their conversation with Able concerning financing and the rate of interest to be charged leaves no room for any question on the nature of this transaction. It was a cash sale with the balance above the downpayment to be financed. No time sale price was discussed. The first time the plaintiffs heard or saw the actual time price was when exhibit No. 1 was signed. Item 9 listed a time selling price. Exhibit No. 1 was provided by the defendant finance company. The assignment to defendant is printed on the form. The expectation was that the defendant would finance the transaction and advance the balance of the cash price to the seller. The time price differential is the charge for this advance along with the advance for insurance. The time price differential exceeds 9 percent simple interest, so the transaction was a usurious one, as found by the trial court.

It is apparent on the face of exhibit No. 1 that we

have a finance transaction, and that usurious interest is being exacted. As we said in General Motors Acceptance Corp. v. Mackrill, *ante* p. 631, 122 N. W. 2d 742, regardless of the term used, if the result is a charge for the loan of money or for the forbearance of a debt, the result is interest.

Defendant argues that this transaction was an installment sale and that the usury rules are not applicable to installment sales. With this broad statement we must disagree. We have repeatedly said that in considering whether such a transaction is a time sale made in good faith or a loan, the court will look through the form and examine the substance. State ex rel. Beck v. Associates Discount Corp., 168 Neb. 298, 96 N. W. 2d 55. Here exhibit No. 1 clearly discloses the nature of the transaction, and we find it to be a scheme or artifice to avoid the effect of the usury statute. Unless this is true, usury could be avoided in every case by placing the transaction in the mere form of a time sale contract. Our law is well settled that if a purported time sale is in fact a loan, and the loan is in violation of the Installment Loan Act, the penalties of the act apply to it. See Powell v. Edwards, 162 Neb. 11, 75 N. W. 2d 122.

There seems to be an impression that if a cash price is quoted and the buyer is unable to pay cash, it is then possible to apply a certain schedule of rates or charges to the cash price in order to determine the time sale price, the difference being denominated a time price differential. It is possible to do so if the resulting charge does not exceed 9 percent simple interest. If it does, we have a usurious transaction. Where a time sale price is determined by applying a certain schedule of rates or charges to the cash price, the resulting product is interest. This is merely a sale for a cash price, with the difference between the money the buyer has and what he needs being financed. When we look through the form, can we come to any other

conclusion but the one that the difference between the price and what the buyer finally pays is the cost of carrying the balance of the cash price? To put it another way, the charge is for the forbearance to collect the full cash price, or for the use of money. A rose is still a rose though we may label it a violet. This charge, regardless of its label, is interest. See General Motors Acceptance Corp. v. Mackrill, *supra*. A transaction handled in this manner is essentially a loan to finance the balance of the cash purchase price, and if payable in installments must meet the requirements of the law covering finance transactions.

We specifically pointed to this conclusion when we said in State ex rel. Beck v. Associates Discount Corp., 168 Neb. 298, 96 N. W. 2d 55: "It is not a time sale if a car dealer, in selling a car, actually agrees with the buyer that he will finance (take care of) the balance of the cash purchase price agreed upon and does so, either directly or through others, even though he obtains the schedule of payments and the total amount thereof from a rate chart furnished by a finance company or obtains that information from a finance company by calling its office and then fully informs the buyer of the amount he will be required to pay and the terms thereof. Such a transaction would be a loan to finance the balance of the cash purchase price and if payable in installments must meet the requirements of the statutes relating thereto. And the fact that the buyer knew the terms and provisions of such loan at the time it was made and voluntarily entered into it would not have the effect of waiving the illegality of any provision thereof, if such provision was actually in violation of any of the inhibitory provisions of the installment loan statutes, for the purpose of the Legislature in enacting such laws was, as a matter of public policy under its police powers, to regulate the lenders of money on installment loans as a protection to those of the general public who find it necessary to borrow money on that basis." . . .

The judgment rendered by the trial court includes a money judgment against both the defendant and Jack's Trailer Sales for $1,781.90. This amount included the $500 fictitious trade-in added by Jack's Trailer Sales to offset the inflated price. It is erroneous in that respect. Further, it is undisputed that the defendant received no part of the cash downpayment of $750, and ought not in equity and good conscience be charged with that payment.

We direct that the money judgment rendered against the defendant should be reduced by these two items of $500 and $750, and in all other respects affirm the judgment.

AFFIRMED AS MODIFIED.

BOSLAUGH, J., concurring.

I believe that the court has reached the correct result in this case. Therefore, I concur in the result although I do not agree with all of the statements which are contained in the opinion of the court.

The majority opinion states that if a time price is determined by applying a schedule of rates or charges to the cash price, the difference is necessarily interest. This statement is contrary to what the previous opinions of this court have declared to be the law.

In a number of decisions, commencing with Grand Island Finance Co. v. Fowler, 124 Neb. 514, 247 N. W. 429, this court has held that a time sale made in good faith at a price in excess of a cash price is valid even though the difference between the two prices exceeds the lawful interest for a loan. In Powell v. Edwards, 162 Neb. 11, 75 N. W. 2d 122, the court said: "It is also true that a time sale made in good faith at a price in excess of a cash price, even though the difference exceeds lawful interest for a loan, *which price is arrived at by schedules* furnished by a finance company which solicits contracts so entered into between a purchaser and a dealer, may not be regarded as being tainted with usury." (Emphasis supplied.) In McNish v. General

Credit Corp., 164 Neb. 526, 83 N. W. 2d 1, the court said that it was essential that the buyer actually be informed of and have the opportunity to choose between a time sale price and a cash sale price.

By a series of decisions this court has held that a time sale made in good faith is valid; that it is essential that the buyer be quoted a cash price and a time price; and that the time price may be computed by the use of schedules. The effect of the language in the majority opinion is to destroy the validity of all time sale contracts which were made in good faith in reliance upon previous decisions of this court. Such a result should be avoided if at all possible.

If the law is to be changed, I believe that the change should be made by legislative process. But, if the change is to be made by judicial decision, then the decision should operate prospectively only. In that respect I concur in Judge Brower's remarks concerning the prospective operation of such a decision.

BROWER, J., concurring.

I concur in the result reached by the court in its decision herein. The opinion holds that the difference between the cash price and time price of merchandise is interest and if the time price differential is more than 9 percent it is a usurious transaction. With this conclusion I agree.

The original reason for the exclusion of the time differential from the operation of the usury statute is discussed in an article appearing in 55 Northwestern University Law Review, p. 303, stating: "This view has traditionally been justified on the theory that a person finding it necessary to borrow money is in a disadvantageous bargaining position and deserving of statutory protection, whereas a purchaser's position is not analogous since should he find the price unsatisfactory he can always refrain from making the purchase.

"This distinction appeared before the advent of large scale credit buying in a period in which the interests

of the merchant class were considered paramount. It is subject to attack for disregarding the facts of present day economic life. It is difficult to understand why a consumer should be granted the protection of the usury statute when he makes a loan to facilitate a purchase, but is denied that protection when he makes the same purchase on credit granted by the dealer."

To my mind the person without adequate funds to buy an automobile or household furniture or appliances, radios, or a television set, or many other items for cash who must have one for his business or family is in about the same position as far as being able to walk away from the dealer and go elsewhere as a debtor is to go from one finance company to another. I can see little difference in the two situations.

The rule that a time sale of goods or merchandise did not involve interest which grew up long before its adoption in this state appeared to be sound reasoning at the time it originated. At that time such dealings were quite simple and modern commercial transactions based on time sale credit were not in vogue. There were in such a transaction other risks and factors.

Since then installment sales have increased by leaps and bounds. The rapidity of their increase and the volume of such sales can be seen from the tables in the discussion in the article on Retail Installment Sales in 45 Marquette Law Review (1962) 555.

I am convinced that the seller of merchandise and the buyer think of the amount paid to effect a time sale as interest. Even though the buyer is totally unable to appreciate the rate of interest he is paying I think he knows that some interest is being paid and wouldn't know anything about a "time differential" unless it was explained to him. The dealer must buy other goods to sell in turn and in many cases must pay interest himself. In most cases I believe he would consider the difference between the cash and time

price as interest if it were not carefully explained to him by the finance company or his lawyer.

In short I think today it is interest received for forbearance of the dealer to collect the cash price and that the same law of usury should be applied to the time differential as to interest on a loan.

To my mind however this is a new rule of law in conflict with our previous holdings.

Beginning with the case of Grand Island Finance Co. v. Fowler, 124 Neb. 514, 247 N. W. 429, this court held: "A dealer in automobiles may in good faith sell a car on time for a price in excess of the cash price without tainting the transaction with usury, though the difference in prices may exceed lawful interest for a loan."

A long line of cases followed, always giving lip service to this rule and asserting that a sale of property by an owner on time if made in good faith was not usurious regardless of the amount that the time price exceeded the cash price. In most all subsequent cases this court discussed numerous situations between seller and buyer with generally a finance company involved to determine whether the transaction was a loan or a time sale. This was because the difference between the cash and time price generally exceeded the interest which would have been allowed under the various interest statutes. After looking through "form to substance" the transaction was generally held to be a loan involving interest.

In my opinion this court in changing the rule should clearly overrule Grand Island Finance Co. v. Fowler, *supra*, by name and the long line of cases stemming from it. That would avoid confusion and lend clarity to the opinion.

However, in such a case a great number of important financial transactions have been consummated relying on the faith of these decisions of this court. We should not in my opinion endanger their validity by a decision acting retroactively.

I have never hitherto favored prospective decisions. I am sure courts do not favor them except in cases in which great numbers of persons have acted on important matters. relying on such decisions. I feel however that the present situation is such a case.

This has been done in cases of importance in other states. Knecht v. St. Mary's Hospital, 392 Pa. 75, 140 A. 2d 30; Spanel v. Mounds View School Dist., 264 Minn. 279, 118 N. W. 2d 795. It has been approved by the Supreme Court of the United States in Great Northern Ry. Co. v. Sunburst Oil & Refining Co., 287 U. S. 358, 53 S. Ct. 145, 77 L. Ed. 360, 85 A. L. R. 254. In at least one decision this court has done so. Fielding v. Publix Cars, 133 Neb. 818, 277 N. W. 331. Finally it has been applied to its rules in distinguishing time sale transactions from usurious loans by the Arkansas court in Hare v. General Contract Purchase Corp.. 220 Ark. 601, 249 S. W. 2d 973. I would have applied the rule announced in our opinion prospectively.

There is a discussion in 60 Harvard Law Review 437 on the prospective operation of decisions holding statutes unconstitutional. From this note it is apparent that many courts have made their decisions prospective only when setting aside a statute upon which many persons have relied and important transactions taken place. I would have applied our decision in Elder v. Doerr, *ante* p. 483, 122 N. W. 2d 528, prospectively also.