KARL OVERBECK, INDIVIDUALLY AND AS A MEMBER OF THE CLASS DESCRIBED IN THE COMPLAINT, AND ON BEHALF OF ALL MEMBERS THEREOF *v.* SEARS, ROEBUCK AND CO., A NEW YORK CORPORATION.

[No. 2-774A156. Filed June 23, 1976. Rehearing denied July 20, 1976. Transfer denied October 22, 1976.]

---

*Williams & Williams,* of Covington, *Karl Overbeck,* of Monticello, for appellants.

*Ice Miller Donadio & Ryan,* of Indianapolis, *Dellinger, Dellinger & McLaughlin,* of Monticello, for appellee.

SULLIVAN, J.—This case represents the latest, if not the last, consumer-oriented challenge to the legality of a revolving charge account under since-repealed general usury laws. Here plaintiff-appellant Karl Overbeck, individually and as the representative of the class of Indiana credit card customers of defendant-appellee Sears, Roebuck & Co. (Sears) during 1968 and 1969, seeks some $6,000,000 of allegedly usurious "interest" collected from the members of plaintiff class under the "Sears Revolving Charge Account." The trial court, adhering to the logic which compelled our brethren of the First District to uphold the legality of defendant American Oil Co.'s revolving charge account scheme in *Standard Oil Co. (Indiana)* v. *Williams* (1972), 153 Ind. App. 489, 288 N.E.2d 170 (trans. den.), granted Sears' motion for summary judgment. Overbeck appeals, apparently under the mistaken belief that his arguments before this District will prove more persuasive than they were to the First District in *Standard Oil.*

Sears' revolving charge account is virtually indistinguishable from defendants' charge account plan in *Standard Oil.* Under both plans, the credit card customer is given a period of approximately one month (30 days under the Sears plan, 25 days under the American Oil Co.-Standard Oil Co. plan) from the date of each monthly statement during which to pay

the total outstanding balance shown on the statement without incurring a "finance charge". Under the Sears plan, the finance charge "will be the greater of[:]

(a) a minimum charge of $.50 or (b) an amount determined by multiplying the previous balance (last month's new balance) by a monthly periodic rate of 1.5% until the full amount of all purchases and FINANCE CHARGES are paid in full. If the FINANCE CHARGE exceeds $.50, the ANNUAL PERCENTAGE RATE of the FINANCE CHARGE will be 18%."

The American Oil Co. plan at issue in *Standard Oil* contained the following provision:

" 'Buyer agrees to pay a FINANCE CHARGE computed by periodic rates of 1½% per month applied to the first $500 of his previous balance after deducting current payments, credits, and past due insurance premiums, and 1% per month of his previous balance in excess of $500, such FINANCE CHARGE to become part of buyer's outstanding balance.

1½% per month is an ANNUAL PERCENTAGE RATE OF 18%. 1% per month is an ANNUAL PERCENTAGE RATE OF 12%.' " *Standard Oil Co. (Indiana)* v. *Williams, supra,* 153 Ind. App. at 491, 288 N.E.2d at 171.

Both the Sears and American Oil plans required minimum monthly payments to be made of roughly 10% of the outstanding balance if that balance exceeded certain amounts set forth in schedules which were made part of the agreements.

The usury statute of 1879 which both the Sears and American Oil Co. revolving charge accounts are and were claimed to violate is IC 1971, 24-5-1-1, Ind. Ann. Stat. § 19-12-101 (Burns 1964), which provided:

"19-12-101 [9328]. Legal rates of interest on loans or forebearances.—The interest on loans or forbearance of money, goods, or things in action, shall be as follows:
(a) When the parties do not agree on the rate, interest shall be at the rate of six dollars [6.00] per year per one hundred dollars [$100];
(b) By agreement in writing signed by the party to be charged thereby, and not otherwise, any obligor other than a corporation may lawfully agree to pay any rate

of interest not in excess of eight dollars [$8.00] per year per one hundred dollars [$100];

(c) By agreement in writing duly signed by it, and not otherwise, any corporation may lawfully agree to pay any rate of interest whatever.

'Interest', as used in this and the succeeding sections of this act [§§ 19-12-101—19-12-108], shall include discount, and may be paid and collected in advance. [Acts 1879, ch. 24, § 1, p. 43; 1929, ch. 220, § 2, p. 804.]"

The statute under which the claims in *Standard Oil* and this case were brought was a companion section to the portion of the 1879 Act just quoted, as is found at IC 1971, 24-5-1-4, Ind. Ann. Stat. § 19-12-104 (Burns 1964):

"19-12-104 [9331]. Usurious rate of interest in contract— Debtor's recoupment.—When a greater rate of interest than is hereby allowed shall be contracted for, the contract shall be void as to the usurious interest contracted for; and, if it appears that interest at a higher rate than eight per cent [8%] has been, directly or indirectly, contracted for by an obligor other than a corporation, the excess of interest over six percent [6%] shall be deemed usurious and illegal, and, in an action on a contract affected by such usury, the excess over the legal interest may be recouped by the debtor, whenever it has been reserved or paid before the bringing of the suit. [Acts 1879, ch. 24, § 4, p. 43; 1929, ch. 220, § 3, p. 804.]"

Both statutes have been repealed and replaced by the Indiana version of the Uniform Consumer Credit Code, Ind. Ann. Stat. 24-4.5-2-101 *et seq.* (Burns Code Ed. 1974) (hereinafter the UCCC), which was enacted and became effective after Overbeck's suit was filed but after Sears' successful motion for summary judgment.

Obviously, if the usury statutes quoted above are applicable to Sears' Revolving Charge Account, the trial court erred in granting Sears' motion for summary judgment since the Sears' annual percentage rate of 18% exceeds the 8% maximum allowable under § 19-12-101. But the court below, following the First District's reasoning in *Standard Oil,* concluded

that Overbeck failed to present a genuine issue of material fact, and that the law is with Sears, because:

"The statutes relating to usury applies only to a loan of money or to the forbearance of a debt, and upon execution of the agreement between the parties, a time price differential sale was entered into and the transaction as between the parties did not represent a loan of money, nor a forbearance on a then existing debt.

\* \* \*

Statutes relating to usury are in the nature of a penalty and have been effectively repealed by the Uniform Credit Code. No vesting of a penalty can occur until reduction to Judgment and remains executory, and no right exists in the plaintiff to recover the penalty, the act having been effectively repealed."

The two above-quoted bases of decision in the court below are identical to the First District's alternative grounds for decision in *Standard Oil*. That opinion was handed down prior to the trial court's ruling on Sears' summary judgment motion and was relied upon by Sears in its motion. Overbeck does not disagree with the court below that there exists no genuine issue of material fact. His assertion is simply that the law is with him, not Sears, because *Standard Oil* was wrongly decided on both counts. As Sears points out, to obtain reversal, Overbeck's arguments must carry the day as to both issues, since agreement by us with the First District's reasoning as to either of the bases of decision requires affirmance.

## USURY STATUTES INAPPLICABLE TO SEARS' REVOLVING CHARGE ACCOUNT BECAUSE OF TIME-PRICE DIFFERENTIAL DOCTRINE

The first pillar upholding the decision in *Standard Oil* and the court below was the determination that the "time-price differential" theory, or the "time-price" doctrine, immunizes revolving charge account plans like those used by American Oil Co. and Sears from the usury statutes. The doctrine's essence was noted by the court in *Standard Oil, supra,* 153 Ind. App. at 493, 288 N.E.2d at 172,

in the following quotation from *Stevens* v. *Grossman* (1935), 100 Ind. App. 417, 418, 196 N.E. 123, 124:

" '. . . [U]sury can only attach to a loan of money, or to the forbearance of a debt, and that, on a contract to secure the price or value of work and labor done, or to be done, or of property sold, the contracting parties may agree upon one price if cash be paid, and upon as large an addition to the cash price as may suit themselves, if credit be given; and it is wholy immaterial whether the enhanced price be ascertained by the simple addition of a lumped sum to the cash price, or by a percentage thereon. In neither case is the transaction usurious. It is neither a loan nor the forbearance of a debt, but simply the contract price of work and labor done and property sold; and the difference between cash and credit in such cases, whether 6, 10, or 20% must be left exclusively to the contract of the parties, and no amount of difference fairly agreed upon can be considered illegal. (Citations omitted).' "

*See also, Floyer* v. *Edwards* (1774), 1 Cowp. 112, 98 Eng. Rep. 995; *Hogg* v. *Ruffner* (1861), 66 U.S. 115, 17 L.Ed. 38, 14 A.L.R.3d 1065; *Newkirk* v. *Burson* (1867), 28 Ind. 435.

In attempting to persuade us that the First District misapplied the time-price doctrine in *Standard Oil,* Overbeck urges upon us the reasoning and authority of the contrary decisions in *State of Wisconsin* v. *J. C. Penney Co.* (1970), 48 Wis. 2d 125, 179 N.W.2d 641, 41 A.L.R.3d 660; *State ex rel. Turner* v. *Younker Bros., Inc.* (1973), Iowa, 210 N.W.2d 550; *Rollinger* v. *J. C. Penney Co.* (1971), 86 S.D. 154, 192 N.W.2d 699. In all three of these cases, analogous revolving charge account plans were held to be within, and hence violate, usury statutes or constitutional provisions similar to our own. Plaintiff also cites us to the decisions of the Arkansas Supreme Court in *Sloan* v. *Sears, Roebuck & Co.* (1957), 228 Ark. 464, 308 S.W. 2d 802, and of the Nebraska court in *Lloyd* v. *Gutgsell* (1963), 175 Neb. 775, 124 N.W.2d 198, in which credit sale agreements incorporating imposition of finance or carrying charges were held to violate, respectively, a constitutional prohibition against usury and a usury statute, and in which the time-price doctrine was rejected outright rather than distinguished.

Sears replies by citing us to the more numerous decisions which are in harmony with *Standard Oil* in applying the time-price theory in order to exempt revolving charge accounts from the coverage of general usury statutes: *Sliger* v. *R. H. Macy & Co., Inc.* (1971), 59 N.J. 465, 283 A.2d 904; *Dennis* v. *Sears, Roebuck & Co.* (1969), 223 Tenn. 415, 446 S.W.2d 260; *Uni-Serv Corp. of Mass.* v. *Comm'r. of Banks* (1965), 349 Mass. 283, 207 N.E.2d 906; *Maine Merchants Ass'n., Inc.* v. *Campbell* (1972), Me., 287 A.2d 430; *Zachary* v. *R. H. Macy Co., Inc.* (1972), 31 N.Y.2d 443, 340 N.Y.S.2d 908, 293 N.E.2d 80; *Kass* v. *Garfinckel, Brooks Bros., Miller & Rhoads, Inc.* (1973), D.C. App., 299 A.2d 542; *Cecil* v. *Allied Stores Corp.* (1973), 162 Mont. 491, 513 P.2d 704; *Johnson* v. *Sears, Roebuck & Co.* (1973), 14 Ill. App. 3d 838, 303 N.E.2d 627. Sears, of course, argues that these decisions represent the well-reasoned weight of authority.

For substantially the same reasons expressed by the First District of this court in *Standard Oil Co. (Indiana)* v. *Williams, supra,* we hold that the trial court did not err.

At the risk of unnecessarily lengthening our discussion, we deem it appropriate to respond to a fundamental attack by Overbeck upon the authorities upon which our decision rests. Plaintiff points out that there is a certain unreality inherent in the "time-price differential" theory; that it is at worst pure "fiction",[1] or at best "mathematical and intellectual impurity,"[2] to say that Sears' 1.5% monthly finance charge on the unpaid balance is the differential between a cash price for the goods and a "time-price", rather than a "charge . . . for the forbearance to collect the full cash price, or for the use of money . . . ." *Lloyd* v. *Gutgsell, supra,* 175 Neb. at 783, 124 N.W.2d at 204. Plaintiff implies that we should not ignore what we know as men—that a finance charge, which goes up

---

1. Note, *Service Charges for Revolving Charge Accounts: A Time-Price Exemption or Usury?*, 71 Colum. L. Rev. 905, 916 (1971).

2. Townsend, *Survey of Recent Developments in Indiana Law: Secured Transactions and Creditors' Rights*, 7 Ind. L. Rev. 226, 227 (1973).

as the length of time which we put off paying for goods brought on credit increases, is nothing more than "interest" for the free use of the seller's goods and our own cash which we would have otherwise parted with when the goods were first obtained. Overbeck agrees with one scholar's view of the *Standard Oil* decision and admonishes us to learn from the First District's "mistake":

> "Prior to the adoption of the UCCC . . . it was generally believed that a charge in excess of eight percent per annum was usurious because the general statute so provided. Cunning lawyers, however, had long ago hoodwinked the courts of other states and Indiana into neutralizing the language of the statute by various devices. One of these was the 'time price differential' theory. . . . The Indiana Court of Appeals recently fell victim to one of the best hoodwinking jobs in *Standard Oil Co.* v. *Williams* . . . (footnotes omitted.)" Townsend, *supra,* at 227.

While the "time-price differential" theory may seem to some a slender reed upon which to rest a judicial determination, it has been termed the "cornerstone of the sales finance industry," Felsenfeld, *Consumer Interest Rates: A Public Learning Process,* 23 Bus. Law. 931, 932 (1968). The reality of which we must be aware is not the legal nature of the transactions taking place under the terms of the Sears Revolving Charge Account, but the unreality of conducting consumer credit transactions with strict adherence to an 8% per annum ceiling on interest in 1976. As one writer notes:

> "It is generally conceded in the finance industry that extension of consumer credit is significantly more expensive than extension of normal business credit. Indeed, one commentator labels any contrary conclusion 'naive'. If, then, retailers presently availing themselves of the immunizing effect of the time-price doctrine are forced to reduce their rates to 'non-usurious' levels, restrictions of credit would presumably result. In an attempt to reduce costs by minimizing losses, retailers might well extend their charge account agreements to only the most secure risks. Consequently, many middle and lower income families may be excluded from what is presently an important avenue of consumer credit. (footnotes omitted)." Note, *Service Charges for Revolving Charge Accounts, supra,* at 915, 916.

*See also,* Williams, *The Credit Deficiency of Retailers in Arkansas,* 3 Ark. Bus. & Econ. Rev. 14 (1970) (commenting upon and studying the adverse economic effects of the abrogation of the time-price doctrine in Arkansas by the court in *Sloan* v. *Sears, Roebuck & Co., supra*) ; McCallister, *Retail Installment Credit: Growth and Legislation 109* (1965) (commenting upon the adverse economic effects of the Nebraska high court's renunciation of the time-price differential theory in *Lloyd* v. *Gutgsell, supra*) ; Malcom, *The New Maximum Charges,* in *The Realities of Maximum Ceilings on Interest and Finance Charges* 23 (the Conference on Personal Finance Law 1969) ; Comment, Consumer Law: *Revolving Charge Accounts Held to Violate State Usury Law,* 55 Minn. L. Rev. 1244, 1246-1247 (1971). If the "time-price differential" theory is indeed a fiction, it is one not only recommended by case law but compelled by the realities of our society.

In *State* v. *J. C. Penney Co., supra,* the Supreme Court of Wisconsin denied to the defendant department store chain the immunity from the usury prohibition sought for the defendant's revolving charge account plan. One writer suggests that an important factor behind the court's decision was its belief that:

": . . to hold otherwise than it did would be 'to sustain form over substance' and to retard, possibly, intelligent decision-making in an area of commercial transactions in which such decision-making is imperative. * * * Implicit in the decision of the court in *J. C. Penney* is the conviction that the fiction of the time-price doctrine—however useful elsewhere—is no longer useful in determining the legal status of revolving charge accounts. If department stores or gasoline companies in Wisconsin are unhappy, or if consumers, confronted with restricted credit are unhappy, the forum of the state legislature is open to them, and at the very least, the court has ensured that their dialogue in that forum will not be clouded by nineteenth century notions which do not correspond to the realities of peculiarly twentieth century commercial activity. (footnote omitted)." Note, *Service Charges for Revolving Charge Accounts, supra,* at 916.

No such consideration exists in Indiana to impel our rejection of the "time-price" doctrine. Our legislature has laudably acknowledged today's realities and enacted the Uniform Consumer Credit Code to regulate consumer credit transactions.

Having decided that the first basis of decision in the *Standard Oil* case and the court below, that Sears' revolving charge account is not within the purview of the 1879 usury statute because of the "time-price differential" theory, we need not consider whether the enactment of the UCCC after Overbeck filed his complaint justifies summary judgment for Sears.

Affirmed.

Buchanan, P.J. and White, J., concur.

NOTE.—Reported at 349 N.E.2d 286.