RONA ALBERS, APPELLEE, V. OVERLAND NATIONAL
BANK, A NATIONAL BANKING ASSOCIATION, APPELLANT.
324 N.W.2d 396

Filed September 17, 1982. No. 82-146.

Denzel R. Busick of Luebs, Dowding, Beltzer, Leininger & Smith, for appellant.

John A. Wagoner, for appellee.

KRIVOSHA, C.J., BOSLAUGH, McCOWN, CLINTON, WHITE, HASTINGS, and CAPORALE, JJ.

PER CURIAM.

The plaintiff, Rona Albers, commenced this action to obtain a declaratory judgment that a hypothecation agreement to the defendant, Overland National Bank, was invalid. The hypothecation agreement pledged 250 shares of Triad stock owned by the plaintiff as security for any indebtedness of Oscar G. Mueller, the plaintiff's father, to the bank. Both parties filed motions for summary judgment. The trial court sustained the plaintiff's motion and ordered the bank to return the stock certificate, which was the subject of the pledge, to the plaintiff. The defendant bank has appealed.

On August 31, 1979, the plaintiff signed a security agreement, a hypothecation agreement, and an assignment of certificate No. 13 for 250 shares of stock

in the Triad Fastener Corporation, a closely-held corporation, to the defendant.

The plaintiff signed these papers at the request of her father to supply additional collateral to secure his loan at the bank. The plaintiff did not receive a copy of the loan agreements nor any document informing her of her liability in the event of her father's default. The evidence is in conflict as to whether the bank delivered copies of the loan agreements to Mueller for the plaintiff.

The loan to Mueller, which was approximately $79,000, related to his business ventures. It was to be paid in monthly installments and the note bore interest at the rate of 12 percent per annum.

After Mueller defaulted on the loan, the bank gave notice that it would enforce its rights under the agreements. This action was commenced to determine the rights of the parties in the stock. The trial court found that Neb. Rev. Stat. § 45-183 (Cum. Supp. 1980) applied to the transaction and, because the bank had failed to comply with the statute, the bank had no rights in the stock.

The principal issue upon the appeal is whether § 45-183 applies to the transaction. The section is a part of the Consumer Credit Act, sometimes referred to as the "Installment Loan Act" or "Small Loan Act," and provides as follows: "(1) No natural person, other than the spouse of the borrower, is obligated as a cosigner, comaker, guarantor, endorser, surety, or similar party with respect to a loan, unless before or contemporaneously with signing any separate agreement of loan or any writing setting forth the terms of the borrower's agreement, the person receives a separate written notice that contains a completed identification of the loan he or she may have to pay and reasonably informs him or her of his or her obligation with respect to it.

"(2) Such notice shall be in the form prescribed by the Department of Banking and Finance.

"(3) A person entitled to notice under this section shall also be given a copy of any writing setting forth the terms of the borrower's agreement and of any separate agreement of obligation signed by the person entitled to the notice."

The plaintiff had no personal liability so far as her father's indebtedness was concerned. She was not a cosigner, comaker, guarantor, endorser, or surety on his loan. It would seem that she was not a "similar party" within the meaning of the statute because all of the classifications set out in the statute refer to parties who would be personally liable for the indebtedness.

The more fundamental question is whether the statute has any application to a business loan such as that made to Mueller by the bank.

Section 45-183 was enacted in 1979 as a part of L.B. 87, which revised the Nebraska Consumer Credit Act. The committee statement of intent read as follows: "LB 87 revises the Nebraska Consumer Credit Act as well as adds a number of *consumer protective devices for small loans.* Specific requirements for *notice,* curing default, deficiency judgments and revolving credit are in the bill." (Emphasis supplied.) The legislative history supports the conclusion that § 45-183 is a part of the Consumer Credit Act. See, also, Neb. Rev. Stat. § 45-117 (Cum. Supp. 1980), which makes reference to § 45-183 as one of the terms and conditions under which a licensee pursuant to the act can make loans.

In *Gruenemeier v. Commonwealth Co.,* 178 Neb. 66, 70, 131 N.W.2d 713, 716 (1964), the act's purpose was described as follows: "[T]he Installment Loan Act, sections 45-114 to 45-158, R.R.S. 1943, comprehensively regulates and limits all loans made by such a licensee to small borrowers."

The plaintiff relies on cases such as *State ex rel. Beck v. Associates Discount Corp.,* 168 Neb. 298, 96 N.W.2d 55 (1959), which hold that the inhibitory pro-

visions of the Installment Loan Act apply to all persons whether they are licensees or nonlicensees. The rule, of course, has no application if the loan in question is not subject to the act.

In *Pattavina v. Pignotti,* 177 Neb. 217, 128 N.W.2d 817 (1964), we recognized that the Installment Loan Act had no application to traditional loans made by nonlicensees, although payable in installments. We said at 220-21, 128 N.W.2d at 819: "It was never intended, as we view it, to include within the act persons who were not required to obtain a license, who made loans in the traditional manner at 9 percent per annum or less, such as amortized real estate loans, *bank-term loans,* interfamily loans, and others, simply because they were payable in installments. The general purpose of the act was to provide a means for charging interest in excess of 9 percent per annum, to regulate licensees engaging in the lending business under the act, and to provide penalties for violations of the act. A nonlicensee, by the holding of this court, who made an installment loan in excess of 9 percent per annum, is subjected to the penalties of the act, but not to the regulations imposed on a licensed business. To hold otherwise would place numerous types of amortized and installment loans in jeopardy, although made at interest rates at less than 9 percent per annum. This is not an evil contemplated to be corrected; in fact, it is no evil at all. The problem being dealt with is the permitting of rates of interest in excess of 9 percent per annum, in specified cases, ostensibly where the risk is great and the expense prohibitive. We can come to no other conclusion than that the act was never intended to include the traditional form of making loans by nonlicensees at a rate of interest not exceeding 9 percent per annum." (Emphasis supplied.) The reference to the 9 percent interest ceiling is, of course, no longer applicable in view of

the many changes which have been made in the interest statutes.

In *Seldin v. Northland Mortgage Co.,* 189 Neb. 175, 202 N.W.2d 174 (1972), we noted that it may be a question of fact as to whether a particular transaction is subject to the Installment Loan Act. We said there that the term "every loan contract" in the Installment Loan Act means every installment loan contract within the *meaning* and *purpose* of the act.

The Installment Loan Act contemplates a "small loan" where the risk is great and the expense under conventional interest rates prohibitive. The act was never intended to apply to nonlicensees who make loans in the traditional manner at conventional rates. We think it is clear, as a matter of law, that the defendant bank's loan to Mueller was not a "small loan" or "installment loan" within the meaning and purpose of the Nebraska Consumer Credit Act. Section 45-183 was not applicable to the transaction and the defendant was not required to comply with its requirements.

It is unnecessary to consider the other contentions of the parties.

The judgment of the District Court is reversed and the cause remanded for further proceedings.

REVERSED AND REMANDED.